## SOUTHERN WIRE & IRON CO. v. THOMAS. (No. 2821.)

(Court of Civil Appeals of Texas. Texarkana. Nov. 15, 1923.)

**I. Contracts ⬥�covered143—Situation and purpose of parties must be considered.**

In determining what was intended by, and understood from, correspondence looking to the execution of a contract, regard must be had to the situation and purpose of the parties, the subject-matter, and course of negotiations.

**2. Sales ⬥➔52(5)—Acceptance of contract not shown.**

Acceptance of contract or bid for the furnishing of building material *held* not shown.

**3. Contracts ⬥➔15—Mutual assent necessary.**

Mutual assent of the parties to the same subject-matter in the same sense is necessary to all contracts.

**4. Sales ⬥➔52(5)—Acceptance of bid not shown by retention of blueprints.**

Acceptance of a bid or contract to furnish building material *held* not shown by a retention of blueprints submitted.

**5. Contracts ⬥➔22(1)—Assent may arise from acquiescence.**

Assent may be shown by conduct or acquiescence.

Appeal from Hopkins County Court; R. E. Bertram, Judge.

Action by the Southern Wire & Iron Company against J. Bert Thomas, wherein defendant filed a cross-action. From judgment of dismissal, plaintiff appeals. Affirmed.

The appellant, as plaintiff, sued the appellee for $371.06, with interest thereon, and the further sum of 10 per cent. attorney's fees, alleging that the indebtedness sued for was in virtue of a contract in writing for the purchase and sale of certain building material. The appellee specially ·excepted to the petition, and pleaded a general denial, the statute of limitations of two years, and by a cross-action sought to recover $510.37, claimed to be due and owing by the plaintiff.

After hearing all the evidence, the court concluded that the suit of the plaintiff as well as the cross-action of the defendant was "barred by the statute of limitation of two years," and entered judgment accordingly. The plaintiff appeals, and assigns error upon the court's conclusion.

It appears from the evidence that in the early part of January, 1920, the appellee decided to erect a four-story brick building in Sulphur Springs. He had plans drawn to that effect. The appellee owned one lot, and was negotiating with the owner of the adjacent lot to purchase a part of it. The construction of a four-story building entirely depended upon appellee's acquiring the adjacent lot. The appellee went to Sherman and then over to Dallas to see dealers in certain steel material, in order to ascertain the prices of such material. In Dallas, on January 19, 1920, the appellee went to see the vice president of appellant company, with the view of ascertaining the price, the kind, and the ·quantity of steel material that this company could furnish on a four-story building of the kind that was to be built. The vice president gave the appellee the information desired, but no negotiations were entered into at the time. The appellee, as he says, informed the vice president at the time of the visit that the building of "the four stories and wing" was dependent upon his purchase of the adjacent lot. Appellee then returned to Sulphur Springs. The owner of the adjacent lot refused to sell it, so then the appellee decided to build a three-story building, and not a four-story building with "a wing." In February appellee went back to Dallas and again saw the vice president of appellant with the view of ascertaining prices and quantity of steel material for a three-story building. He was given a general estimate of the cost. At the same time the appellee went to see other dealers in the material required. Later, on March 26, 1920, appellant wrote and mailed to appellee a letter, reading:

"Enclosed herewith are contracts covering steel cores and metal laths which we wish you would please look over, and, if acceptable, sign and return one copy to us immediately. Keep one copy for your files. We are fixing to go right ahead with your job, and want this matter all straightened out right away. Owing to changes in market conditions we are unable to protect you any longer in the prices quoted on any of the other items, such as ornamental iron railing. coal chute, fire escapes, floor hardener. However, in case you wish to buy any of these items from us, let us know when you get ready for some, and we will give you the best possible prices available at the time shipment is wanted."

Accompanying this letter were two written proposals, in duplicate, dated March 26, 1920, addressed to appellee, and signed by appellant. One of the proposals reads, in so far as material:

"We propose to furnish, as conditions and terms stipulated, free on board cars Dallas, Tex., freight allowed f. o. b. cars Dallas, Tex., the following: Reinforcing steel, bent as required, but not otherwise fabricated. in accordance with final revised plans which are being sent you under separate cover, all for the net complete sum of $1,215 f. o. b.· cars Dallas. Terms: Owing to the fact that we are now having to pay cash for our steel, we have to ask our customers to pay us within 10 days after date of shipment for all reinforcing steel. Deliveries: All promises of delivery are as closely estimated as possible, but seller does

⬥➔For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

not guarantee deliveries which are contingent upon general conditions. * * * It is expressly agreed that there are no promises, agreements. or understandings outside of this contract. This proposition is made for immediate acceptance, and will constitute a contract when accepted in writing by the buyer and executed in writing by the duly authorized official of the sellers."

The other proposal reads, in so for as material:

"We propose to furnish, as conditions and terms stipulated, free on board cars Dallas, Tex., freight allowed to Sulphur Springs, Tex., the following: The necessary #26 gauge, corrugated type, steel floor cores, as made by the Berger Manufacturing Company for the new building for Mr. Thomas at Sulphur Springs, Tex., in accordance with our revised structural plans, for the net complete sum of $750. Necessary #24 painted 3/8 rib-plex lath required to go under these steel cores in making the metal lath ceiling for the sum of $325. Terms: Net cash in 10 days from date of shipment leaves the factory at Canton, Ohio, this shipping date to be determined by the bill of lading. Deliveries: All promises of delivery are as closely estimated as possible. but seller does not guarantee deliveries, which are contingent upon general conditions. * * * This proposition is made for immediate acceptance, and will constitute a contract when accepted in writing by the buyer and executed in writing by the duly authorized official of the seller."

Appellee received the letter and the inclosures on March 27, or 28, 1920, as well as the following addressed to him, dated March 27, 1920, and signed by appellant, reading:

"We called you over long distance phone yesterday, and they told us you were in Dallas. We then called you at the hotel here, but without results. We have therefore decided to go ahead with your order as your last letter says for us to do so, but ask that you please sign the contract we sent you at Sulphur Springs, and return them to us as soon as possible. We sent you two sets of the revised structural plans for you to give to the man who does the erection work."

Appellee denies, and there is no other evidence, that he ever wrote any "letter" referred to in the above. On April 1, 1920, the appellee sent to appellant at Dallas, and appellant received it, the following telegram:

"If this best price can use material. Am writing."

On April 1, 1920, appellee wrote, and appellant received it, the following letter addressed to appellant:

"Gentlemen: Received your message, also in answer to phone conversation will state I talked with Mr. Westbrook after talking with you. I received the blueprints which you have sent me, and which I had sent to Mr. Westbrook. In a letter from him he states you are entirely out of line from the first bid you made on the steel. If you will recall you made your first estimate on a four-story building with the 15x15 ell, and we asked you to cut out the ell and the fourth floor, and you have only reduced the cost of this $87. This don't seem like it is in line with the first bid, that is we both decided this, and in fact Mr. Westbrook figured the cost should have been reduced not less than $350, or in other words cut out 2,340 square feet flooring. We only had 7,660 at a price for the steel $1,262. Regarding the windows, I sent Mr. Westbrook the blueprints of the windows I had a price on of $836, all rough glass 13 instead of all as you figured on. Your figures were $1,096 and $335 approximately on 11 only, so I think best to cancel all of this with you, or (you) get down some. It is going to delay me quite a lot on the steel not coming up, but I don't feel like I have had a square deal on the protection on the 24,000 pounds of steel, but I don't want any one to lose money on me. So suppose (as) you did not get protection, and in this case, we will call this off, and I will return you your blueprints."

The appellee testified:

"I originally intended to build a four-story building; that was in January and February, 1920. It was while I had in mind to build a four-story building that Mr. Dewees (vice president and sales manager of appellant) gave me the prices of $1,262 on reinforcing steel, and $775 on the other material. I did not build a four-story, or a three-story, but did finally build a one-story building. On January 19, 1920, I went to Dallas and there called on the Southern Wire & Iron Company and saw in person the vice president, Mr. Dewees. I had called on other dealers in construction material. I figured with all of them, on a four-story building, merely to get prices and kind and quantity of material. Mr. Dewees gave me prices on a four-story building and wing. I explained to him at the time that if I could buy the adjacent lot I would put up a four-story and a wing. He made me a price of $1,262 on reinforcing steel, and I pay the freight from Dallas; that is $1,262 including bending and fabricating 24,000 pounds, which is $5.25 per 100 pounds. At the same time he priced me steel ceiling cores for $775, approximately 6,000 square feet. He priced me 650 square yards of lath at 60 cents per square yard. After these propositions I came back home. I made no trade with any one on this trip. I found that I could not buy the adjacent lot, so had to plan to cut to a three-story building. After that, in February, I was in Dallas, and Mr. Dewees said to me: 'Let me place the order for you; by your cutting the building down we will cut the prices down in proportion, one-third.' But I made no trade whatever at that time, and went to see other dealers in this material. On March 27, or 28, 1920, I received through mail from the plaintiff the proposals and letter all dated March 26, 1920. and a second letter dated March 27, 1920. I did not sign the proposals because I had made no contract whatever with the company to that time. I had simply talked and advised with them as I had with the other concerns; and besides I did not like the wording of the contract, and thought the whole thing unnecessary. I simply wanted a certain kind

and quality of steel building material for a fixed price in cash. I had the money and was contemplating paying cash. And the proposals said nothing about a reduction to a three-story building, but contemplated a four-story building. After the receipt by me of the letters and proposals I sent the telegram, and same date wrote and sent the letter. A day, or maybe two, after sending this telegram I went to Dallas to see other dealers as well as the plaintiff. I saw and had a conversation with Mr. Dewees with reference to the purchase of the needed material. Mr. Dewees said, 'I will tell you what we will do; you go ahead, and we will, ship you the material and will cut the price down to a three-story building.' I asked him, 'How much will it cost?' He said, 'I will cut the price down one-third throughout; that is, we have quoted 24,000 pounds of reinforcing steel for $1,262 on a four-story building, and we will sell you the reinforcing steel for a three-story at same price of $5.25 per 100 pounds, and we will knock off one-third of the $775 for ceiling cores. and will sell the lath at same price of 60 cents per square yard but will reduce from 650 square yards to that needed for a three-story building.' We then traded. Up to that time I had made no trade with them whatever. In this same conversation Mr. Dewees asked me how I wanted to pay for it, cash or shipper's order bill of lading. This was the first time in any conversation it had ever been mentioned as to how the payment was to be made. I told Mr. Dewees I wanted to pay cash, and he said, 'I will give 2 per cent. off for cash.' I received the first shipment on April 23, 1920, for which I at once sent a check in payment, less 2 per cent. discount. In the account for this shipment there was an overcharge of $153.03. I at once informed the company of this overcharge. The second shipment arrived in Sulphur Springs about July 23, 1920. The statement of this shipment was $1,140. From this statement I deducted the $153.03 overcharge. and for drayage and discrepancies in ceiling cores, aggregating $371.60, and sent my check for the balance."

This $371.60 is the amount in suit. The evidence does not show whether appellee did or did not return to appellant the written proposals of March 26, 1920.

W. H. Graham, of Dallas, for appellant.

Allen, Sellers & Beasley, of Sulphur Springs, for appellee.

LEVY, J. (after stating the facts as above). In the court's decision that the appellant's suit was barred by the two years' statute. of limitation, there is involved the further conclusion by him that the agreement between the parties under which the building material in suit was sold and bought was an oral, and not a written, agreement. If the court was warranted in finding, or in attaching the legal effect to the evidence that the agreement was oral and not in writing, then the judgment must be affirmed, for it affirmatively appears that the appel-

256 S.W.—39

lant's suit was filed more than two, but less than four, years after the date of the alleged breach of the agreement. The appellee contends that the agreement was entirely oral and not in writing. The appellant contends that the two proposals signed by appellant, accompanied by the letter and telegram which the appellee sent, constituted a legal contract between them in writing; but if they did not constitute a contract, that then the two proposals signed by the appellant and mailed to the appellee and retained by him did, in legal effect, constitute a written contract between the parties.

[1] The first question, then, is whether certain correspondence shows a contract. In determining what the one party intended and what the other party ought to have understood about the correspondence, regard must be had to the situation and purpose of the parties, the subject-matter and course of the negotiations. Prior to the date of the appellant's letter and inclosure of two proposals, the evidence is without conflict that appellee had only sought information from appellant concerning the prices, quality, and quantity of certain building material needed in the erection of a four-story brick store building. Under these circumstances, and evidently with the view of actually obtaining a contract of sale, the appellant mailed a letter to appellee inclosing proposals of sale of the material about which appellee had been inquiring. The letter informed the appellee that if, after looking over the inclosed proposals, they were "acceptable," then to "sign and return one copy to us immediately." After reading the letter and looking over the proposals, the appellee then sent a telegram saying:

"If this best price can use material. Am writing."

[2, 3] The language of the telegram is not that of an unconditional acceptance. The words "can use" do not indicate a positive acceptance. The words "am writing" were sufficient to put the appellant on notice that more would be said regarding the proposals, and sufficient to indicate that the appellee had not at that time accepted the proposals as they were written. The "writing," which was the letter of appellee, following the telegram, and received by appellant properly read. does not evidence an acceptance, but rather a refusal, on the part of appellee to accept the proposals as they were written. The letter first expressly objects to both the quantity of and the price charged for the steel material as stated in the proposals. The letter insists that, as to the steel material, "the cost should have been reduced not less than $350, or in other words cut out 2,340 square feet flooring." He was entitled to determine whether price and quantity

suited him. ; And, continuing further, the letter seems to make express objection to the lack of completeness and fullness of the proposals in the failure to guarantee "protection on the 24,000 pounds of steel." The letter in effect states that "We will call this off, and I will return your blueprints" for the reason that. "I don't feel like I have had a square deal on the protection on the 24,000 pounds of steel." In the light of appellant's letter, the appellee was informed that certain "items" were not in the proposals because, "owing to changes in market conditions, we are unable to protect you any longer in the prices quoted on any of the other items," naming them. These "items" were a part of the material the appellee wanted to buy to go in the building to be erected. Therefore, it appears that the appellee's telegram failed to accept, and that his letter following the telegram refused to agree, to the proposals as they were written, and offered to him. There is shown an insufficiency of assent on appellee's part. It is an elementary principle, common to all contracts, that there must be a mutual assent of the parties to the same subject-matter in the same sense. No contract is completed until each party has accepted every proposition of the other without modification or the addition of new matter. There must be a clear accession on both sides to one and the same set of terms. 1. Parsons on Contracts, 476; Bishop on Contracts, § 334; 1 Elliott on Contracts, § 26.

[4, 5] Next appellant insists that the appellee's act of retaining the proposals with voluntary acceptance on his part of the benefit of the transaction is equivalent to a consent to all the obligations arising from the proposals, and is in legal effect a contract. Assent of course may be indicated by conduct or acquiescence. In this case, though, such circumstances do not exist, for it is affirmatively shown that a day or two after sending the telegram and the letter the appellee went in person to see the vice president of appellant, and there new negotiations were entered into, and finally, according to appellee's evidence, an oral contract was mutually assented to, having somewhat new terms from the original written proposals. Under this distinct oral contract, according to appellee, the material was sold by appellant and purchased by him for the erection of a one-story, and not a three nor a four story, building. Therefore the evidence is sufficient to support the trial court's findings of purchase and sale under a distinct oral, and not written, agreement.

The case of Clegg v. Brannan, 111 Tex. 367, 234 S. W. 1076, cited by appellant, is different from this case.

The judgment is affirmed.