## TEXAS CONST. CO. et al. v. DEARING et al. (No. 1983.)

Court of Civil Appeals of Texas. El Paso. May 12, 1927.

Rehearing Denied May 26, 1927.

1. Contracts ⬅198(6)—Requirement that contractor test well as it was being "drilled" held to mean during progress of work and not limited to drilling.

Requirement of contract that plaintiffs' test well as it was being "drilled" considering situation of parties at time of its execution *held* to mean during progress of work, and not limited to mere use of the drill, so that contractors thereunder assumed responsibility of testing well during which the casing collapsed and the well was destroyed.

2. Contracts ⬅176(2)—Where doubt as to meaning of contract arises from language used, question as to what parties meant is for the court.

Where doubt as to meaning of written contract arises from language the parties used and not from extrinsic matters, then question as to what parties meant is for the court and not for jury.

3. Contracts ⬅143—In construing contracts they must be viewed in their entirety.

In the construction of contracts they must be viewed in their entirety.

4. Contracts ⬅152—Generally, ordinary use of terms governs.

Generally, the ordinary use of terms in a contract governs.

---

⬅For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

**5. Contracts** ⬅➡280(5)—**Well driller held not entitled to recover price, where . casing collapsed during test required by contract.**

Collapse of well casing during test by driller as required by contract *held* to preclude recovery of agreed compensation.

Appeal from District Court, Dallas County; Claude M. McCallum, Judge.

Action by R. H. Dearing and others, partners doing business under the name of R. H. Dearing & Sons, against the Texas Construction Company and another. From a judgment for plaintiffs, defendants appeal. Reversed and remanded.

Beall, Worsham, Rollins, Burford & Ryburn, of Dallas, for appellants.

Smithdeal, Shook, Spence & Bowyer, of Dallas, for appellees.

PELPHREY, C. J. Appellees, R. H. Dearing, W. R. Dearing, and Roy E. Dearing, partners doing business under the name of R. H. Dearing & Sons, brought this suit in the 101st district court of Dallas county, Tex., against the Texas Construction Company, a corporation, and the Dallas Power & Light Company, a corporation, for the recovery of $24,422, with legal interest thereon from January 1, 1924. Appellees alleged that the two appellants were in fact the same entity in that the Texas Construction Company was a mere agency of the Dallas Power & Light Company.

Appellees alleged that they had entered into a written contract with appellant Texas Construction Company to drill a deep water well on the property of appellant Dallas Power & Light Company, in Dallas, Tex.; that they had performed the contract, and that the completed well had been accepted by appellants; that thereafter the casing in said well collapsed without fault of appellees; that upon agreement of the parties another well was drilled by appellees; that they had been paid the sum of $24,054.50; and that appellants refused to pay the balance due them of $24,422.00. Appellees made the written contract a part of their petition.

Appellants answered by general demurrer, special exceptions, general denial, and by special pleas, alleging that the well had not been completed and finished as provided in the contract, but that before it had been cleaned out and tested, before it had been delivered to appellants, or had been accepted by them, the casing had collapsed, from no fault of appellants, and thereby rendered useless; that the well had not been fully completed and accepted by both appellants, as provided for in the contract, before the collapse occurred; that appellees were engaged in making a requested test of the well at the time of its destruction; that appellant Texas Construction Company had exercised its option, under the contract, and had demanded that appellees install a strainer casing from the lower extremity of the 8¼-inch casing to the bottom of the well, and that appellees had wholly failed to make such installation; that appellees had, in attempting to get the casing past a rock encountered in drilling, damaged the casing to such an extent as to render it unfit and thereby caused it later to collapse; that in cleaning and testing the well appellees had either permitted too much air to get into the pipe or had failed to lower the air line to a proper depth, and thereby caused the destruction of the well; and that appellees were negligent in failing to cut off the air pressure in the air line when they discovered that the water had ceased to flow through the water line.

Appellees also filed a cross-action alleging that they were entitled to recover of appellants the sum of $5,967.50 for a delay of 155 days over and above the time specified in the contract, at the rate of $38.50 per day, same being the amount provided for in the contract as liquidated damages.

Appellants filed a supplemental petition generally denying the averments contained in appellees' answer and alleging that if appellants failed or refused to accept the first well, such failure or refusal was unreasonable and amounted to a breach of the contract; that the officers and agents of appellants were on the ground every day during the drilling of the well, knew what materials were being used and how the work was being done and approved and accepted same, measured the well, made no objection as to the materials used or the manner in which the work was done, and that they are estopped to say that they did not intend to and did not accept the well; that, under the contract, appellants had no right to request a test of the well to be made by appellees after they had completed the drilling through the Paluxy sand.

Appellees further specially denied that they were engaged in making a test of the well at the, time the casing collapsed, but allege that the test was being conducted by appellants.

They further specially allege that the casing, which was damaged in trying to lower it past the rock obstruction in the well, was withdrawn and repaired by appellees and as repaired was accepted by the officers and agents of appellants; that the test was being made by appellants, and that any negligence in not cutting off the air when, the water ceased to flow through the water line was the' negligence of appellants; that the appellants waived the placing of the strainer casing in the well; that appellants are receiving benefits from the drilling of the first well in that the water from the first well flows into the second well and has increased the capacity of the second well; and that appellants, at the time the agreement was made as to the drilling of the second well, without prejudice to

the rights of either party, waived their right to any claim for penalty or liquidated damages under and by virtue of the contract. Appellants by supplemental answer denied generally the allegations in the supplemental petition of appellees, and specially denied that the drilling of the first well increased the water supply in the second well.

The case was submitted to the jury on special issues, and the jury found in response thereto as follows:

(a) That appellees completed the well in accordance with the provisions of the written contract.

(b) That neither of the appellants informed the appellees, after the well was started and before the casing collapsed, that they wanted the strainer casing installed.

(c) That neither of appellants requested a test to be made of the well by appellees while the same was being drilled after the Paluxy sands were encountered.

(d) That the collapse of the casing was not caused by appellees' churning the casing up and down, attempting to get it past a rock ledge.

(e) That the appellants, prior to the collapse of the casing, had waived the right to have the well shot by appellees before accepting same.

(f) That the time had not expired for appellants to request that the well be shot by appellees, prior to the collapse of the casing.

(g) That the well had been delivered to appellants before the casing collapsed.

Upon these findings the court rendered judgment in favor of appellees against appellants for $27,861.93, and against appellants on their cross-action. From that judgment this appeal has been perfected.

## Opinion.

That a better understanding may be had of the questions involved, we here quote such parts of the written contract as we consider pertinent to the issues:

(2) "Said well to be drilled and cased from 24 inches above the normal ground surface of the earth adjacent to the well down to and through all of the Paluxy sands; but in no event to be drilled to a greater depth than 1,800 feet. From the surface of the earth down to a depth of 500 feet said well shall be cased with 22-inch inside diameter 75 pound per lineal feet steel casing, which shall be welded where joined. Said casing shall be set in such manner as to case out all shaly, sand or mud formations, and also all waters above."

(3) "From said point, that is, from the point 500 feet below the surface of the earth and at the bottom of the 22-inch casing, said well shall be cased to the upper Paluxy sands with an 8¼-inch 32 pounds per lineal feet Byers wrought iron liner or packer casing, which casing shall be equipped with long oil country couplings, and shall be provided with ten threads to the inch. The lower or 8¼-inch casing shall be so set as to center accurately with the 22-inch casing above it, and shall be set in such

manner as to case out all shaly, mud or sand formation and all waters above."

(4) "From the lower extremity of the sand 8¼-inch casing, said well is to be drilled from said point, until it is completed, with as large a bit as practicable to pass through the 8¼-inch 32 pound per lineal foot casing. Said well shall at the option of the company, be cased with a strainer casing from the lower extremity of the 8¼-inch casing to the bottom thereof with 6 inch inside diameter Byers wrought iron 19.66 pound per lineal foot casing. Said 6-inch casing to be drilled with five-eighths inch holes over its entire area, so that the maximum distance between the center of any adjacent holes will be 3-inch centers."

(5) "The first 500 feet shall be drilled and casing set before the well is drilled below that depth. It shall then be drilled to the depth that it is to be cased with the 8¼-inch casing, as aforesaid, and said casing set before it is drilled below that depth; and after the 8¼-inch casing is set, said drilling shall then be completed."

(6) "The contractor agrees that all casing shall be set in such manner and all drilling operations conducted in such a way, that if it is deemed necessary or advisable said well can be 'shot' to increase the flow, without injury or damage to either the casing set or the drilling then completed."

(7) "The contractor agrees to furnish all labor, derrick, power, casing, materials, equipment, tools, freight and delivery expense, and all other things, whether labor or materials, without limitation, necessary to drill and equip said well and to finish the same as hereinabove set out, and to deliver the same to the company free of all material, labor or other liens in a first class workmanlike condition, and in accordance with the conditions herein set out at $22.50 per lineal foot, for first 500 feet, and $11.50 per lineal foot for the remaining depth, but not to exceed a total depth of 1,800 feet."

"(c) Upon completion of said well, in accordance with all the provisions of this agreement, and upon acceptance of the work by company and by owner, company will pay to contractor the balance of the contract price provided for in this agreement."

(10) "The contractor agrees with the company that, in the event it becomes necessary to shoot the well, the company shall pay only the actual cost thereof; but that said cost will not exceed, under any circumstances, the sum of seventeen hundred and fifty dollars ($1,750) (which shall be in addition to the contract price aforesaid), which said amount shall include any changes or rearrangements made necessary by the result of the shooting of said well."

(11) "The contractor agrees to test said well, as the same is being drilled, after the Paluxy sands have been encountered, whenever and as requested by the company, and in making said test the company shall furnish, at its expense, all apparatus for making said test, and the contractor shall, at his expense, make said test and furnish all labor necessary in making same. The company may have the drilling of said well stopped, at its option, at any time after the Paluxy sands have been encountered, and payment shall be made in such case for the actual number of feet drilled."

(12) "Work shall commence on said well within five days from the date of signing this

contract, and said well shall be completed and fully equipped within 200 work days from the date of starting. The contractor hereby acknowledges that the time for the completion of the work is of the essence of this contract, and that, in the event of his failure to complete the work within the time specified, the owner will be greatly damaged, and its damage will be difficult of ascertainment. It is therefore agreed, and the contractor binds himself, that he will pay the owner the sum of thirty-eight dollars and fifty cents ($38.50) per day for every day's delay in the completion of the work beyond the date specified, which sum it is hereby agreed shall be construed as liquidated damages and not as a penalty."

(15) "If, at any time before the said well is completed, the said company shall desire that another well shall be drilled on the same lot as the well herein contracted for is drilled, the contractor agrees to· drill said second well in ·accordance with each and every of the conditions, provisions and terms of this contract, save and except that it agrees that the contract price of the second well shall be two thousand dollars less than the total contract of the well herein contracted for for the same depth. If the second well is drilled to a greater·depth than the first well, the excess shall be paid for at $11.50 per lineal foot for such excess. In the event the company exercises its option of having said second well drilled, it shall give the contractor written notice of its exercise of said option at least five full days before the completion of the well herein contracted for."

Appellants requested the court to instruct the jury to return a verdict for them, and assign error to the court's refusal to so do.

[1] In considering these assignments the question arises as to whether, under the circumstances of this case, the court should have construed the contract or have submitted the question to the jury.

Appellees contend that the test that was being made at the time the casing collapsed was not part of their duty because of the fact that the drilling of the well had proceeded through the Paluxy sands and was, therefore, completed; while appellants' contention is that the term "drilling" as used in the paragraph of the contract relating to tests being made included more than the mere sinking of the hole.

[2] If the construction of the contract was for the court, then we think the court was in error in not instructing a verdict for appellants. It appears to be well settled that where the contract is in writing and ' the doubt as to its meaning arises from the language the parties used, and not from extrinsic matters, then, and in that event, the question as to what the parties meant is for the court and not for the jury. Penn et al. v. Hare (Tex. Civ. App.) 223 S. W. 527; Simpkins on Contracts, 494 et seq.; 2 Elliott on Contracts, 855, 858; 6 R. C. L. 862, 863; 13 C. J. 796.

A proper disposition of this case depends on the construction of paragraph 11 of the contract and on the phrase, "the contractor agrees to test said well, as the same is being drilled, after the Paluxy sands have been encountered, whenever and as requested by the company," and clearly its interpretation does not depend upon any extrinsic facts, but upon the words used taken in connection with the other provisions of the agreement, and therefore for the court.

[3] In the construction of contracts, they must be viewed in their entirety (Griffin v. Bell [Tex. Civ. App.] 202 S. W. 1034; Hunter v. Gulf Production Co. [Tex. Civ. App.] 220 S. W. 163; Smith & Hayslip v. Wilcox Oil Co. [Tex. Civ. App.] 253 S. W. 641), and the situation and purpose of the parties must be considered (Southern Wire & Iron Co. v. Thomas [Tex. Civ. App.] 256 S. W. 607).

[4] As a general rule the ordinary use of the terms shall govern, but as said by the court in San Jacinto Oil Co. v. Fort Worth Light & Power Co., 41 Tex. Civ. App. 293, 93 S. W. 176:

"It is not universally so, and it is sometimes a matter of great difficulty to adopt the precise shade of meaning that will best express the intent of the parties. In all rules of construction, however, the dominant purpose is to ascertain, if it be possible, what was in the minds of the parties to the contract at the time it was made. For it is elementary that it is no contract unless the parties thereto assent to the same thing in the same sense. And in the ascertainment of the meaning of the terms used the situation of the parties and of the subject-matter at the time, and the acts and declarations of the parties, may be looked to. Nor is it necessary that the words to be interpreted shall be themselves ambiguous, and a party will be held to that meaning which he knew the other party to the contract supposed the words to bear."

We find that appellants were desirous of having a deep water well drilled, and that appellees were in the business of drilling wells and therefore were anxious to do the drilling of the present well; that the parties entered into a written contract in which they provided for the casing to be set so that the well might be shot, if necessary, that the company, at their option, might have a strainer casing installed through the Paluxy sands, and that tests should be made whenever and as requested by the company.

Considering the situation of the parties at the time the contract was executed and the purpose in the minds of the parties at that time, we are of the opinion that the expression, "as the same is being drilled," used in paragraph 11, was intended by the parties to mean during the progress of the work and was not intended to be limited to the mere use of the drill.

If we are correct in this conclusion, then the company had the right, under the, contract, to request the test to be made which was made, and, the well having been destroy-

ed during the making of the test, the loss would fall on the contractor.

[5] We think the evidence is clear that the test was being made by the contractor, and, his service therein not being gratuitous, but being in performance of his obligation under the contract, any loss occurring in the making thereof would fall where the parties by their agreement had placed it.

The court should have construed the contract, and have given the peremptory instruction requested by appellants.

In the state of the record we shall not pass upon the cross-action, but will, for the errors pointed out, reverse the judgment of the court below and remand the cause.

Reversed and remanded.