THE SAN JACINTO OIL COMPANY ET AL. V. THE FORT WORTH LIGHT
AND POWER COMPANY ET AL.

Decided January 6, 1906.

**1.—Construction of Contracts.**

As a general rule, in the construction of contracts the ordinary use of its terms is to be applied. But this is not universally so. The dominant purpose is to ascertain what was in the minds of the parties to the contract at the time it was made. Unless the parties to a contract assent to the same thing in the same sense it is no contract. In ascertaining the meaning of the terms used, the situation of the parties and of the subject matter at the time, and the acts and declarations of the parties, may be looked to. A party to a contract will be held to that meaning which he knew the other party supposed the words to bear.

**2.—Same—Contract to Furnish Oil—Expression "Failure of Oil Wells" Construed.**

In a contract to furnish oil, it was provided that the contract should not be voidable except (among other reasons) "by failure of oil wells." Facts and

circumstances considered, and said expression held to mean a failure of the wells, then owned by the oil company, to flow by natural pressure, as they were doing when the contract was made.

Appeal from the District Court of Tarrant. Tried below before Hon. Irby Dunklin.

*Capps & Canty, A. B. Flanary, Harris & Harris* and *O. L. Stribling,* for appellants.—The clause, "failure of oil wells," means a cessation of the wells to produce in the way and manner that they were producing at the time of the execution of the contracts sued upon, and the uncontradicted evidence showing that such wells had ceased to produce oil in such way on and prior to July 26, 1902, it was error to hold the defendant liable and render judgment against it for any amount. Fruit Grower's Assn. v. Fruit Packing Co., 53 Law Rep. Ann., 681; Stewart v. Stone, 14 Law Rep. Ann., 215; Walker v. Tucker, 70 Ill., 527.

*Matlock, Miller & Dycus, Clark & Bolinger* and *Sidney L. Samuels,* for appellee.—On the question, what is meant by the phrase "failure of oil wells" in the contracts sued upon, cited: White v. Pettijohn, 23 N. C., 52-55; American Credit Indemnity Co. v. Carrollton Furniture Co., 95 Fed. Rep., 111; Vaughan v. Dickes, 20 Pa., 509; In re Miller's Estate, 22 Atl. Rep., 1044; Kay v. Scates, 78 Am. Dec., 399; Hackney v. Tracy, 20 Atl. Rep., 560; Parkhurst v. Harromer, 21 Atl. Rep., 826; Toman v. Dunlap, 18 Pa., 72; Eichelberger v. Barnitz, 9 Watts, 447; Powell v. Brandon, 24 Miss., 344-361.

CONNER, CHIEF JUSTICE.—This is an appeal from a judgment in favor of each of the appellees, The Fort Worth Light & Power Company, The Waco Gas Company and the Citizen's Railway Company of Waco, Texas, against the appellants, The San Jacinto Oil Company and its surety the Fidelity and Deposit Company of Maryland, for damages in the sum of $1,828.32 with interest, because of an alleged breach of a contract by the oil company to furnish the appellee companies specified quantities of crude oil from the oil wells of the San Jacinto Oil Company near Beaumont, Texas.

In a general way it will be stated that the facts are as shown by an agreement of counsel, by the answers of the jury to special issues submitted to them, and by the trial court's conclusions of fact filed after the return of the verdict; but there is a question presented by appropriate assignments of error involving a construction of the contract which goes to the very foundation of the cause of action asserted by the appellee companies, and inasmuch as our conclusion thereon disposes of the entire case, we will not here set forth all of the facts appearing in the voluminous record before us, but such only as we deem necessary to an understanding of this opinion.

Henry C. Scott, of St. Louis, Mo., acting for each of the appellee companies, and J. B. Cranfill of Dallas, Texas, acting for the oil company, on the 8th day of April, 1902, executed three several contracts for delivery of oil by the oil company. The contracts were executed at the same time and are generally alike in terms. To secure the perform-

ance thereof by the oil company, a single bond was executed by the Fidelity and Deposit Company, and we shall hereafter refer to the contracts as one, the differences between them being immaterial to our conclusion. The contract recites that the appellee companies were desirous of procuring supplies of oil for the purpose of operating their several plants in Fort Worth and Waco; that the oil company "having oil wells at or near Beaumont," desired to supply the oil, and it was therefore agreed that the appellee companies would purchase of the oil company f. o. b. tank cars at Beaumont, Texas, all the crude oil necessary for their use in operating their several plants for a period of three years, and to pay therefor nine cents per barrel of forty-two gallons each. It was further provided that at the expiration of three years the appellees should continue in full force all the agreements and covenants of the contract for a period of two additional years, and pay to the oil company for oil for such additional period at the rate of ten cents per barrel. The contract contemplated preparation for the use of the oil by the appellee companies, and provided that the periods of time stipulated should commence from the date of the first shipment of oil. It was further provided that the appellee companies should have thirty days after the receipt of the first shipment of oil within which to determine whether or not it was of proper quality and fit for their uses, and if at the expiration of said thirty days the oil was found to be unfit for such uses then they might at their option cancel the agreement. It was further provided that the standard or quality of oil furnished during the thirty days test should be maintained throughout the period of the contract, and in event of the failure to so do, the appellee companies were given the right to terminate the contract, notice to the oil company and opportunity to correct the complaint being provided for. The contract contained the following further stipulation upon the proper construction of which this case must depend, viz: "It is further understood and agreed that this contract is not voidable except by the acts of God, failure of oil wells, through no fault of the party of the second part (The San Jacinto Oil Company) governmental interference, fire or strikes affecting either party to this contract, nor is the party of the second part to be responsible for delays occasioned by transportation companies and its responsibilities cease when it obtains bills of lading from transportation companies."

It also appears that at the date of the execution of the above contract the appellant company had two oil wells near Beaumont, Texas, that were "gushers," or flowing large quantities of oil by reason of their own internal forces. These wells are designated in the record as wells Nos. 1 and 2. The first shipments of oil made under the contract were about the —— day of October, 1902. It was alleged by the appellee companies, and the jury found by their verdict that the appellant oil company breached this contract by a failure and refusal to deliver oil on December 31, 1902. It also appears that on the 16th day of January, 1903, by an order of the Seventeenth Judicial District Court of Tarrant County, Texas, George W. Armstrong was appointed receiver of the property of the San Jacinto Oil Company, and ordered to take possession thereof, which the receiver did on the same day, the oil company, its agents, servants and employes being at the same time enjoined from

interfering with the property. It is also agreed that well No. 2 wholly and completely failed to produce oil prior to October, 1902, and has continued so until the present time. Well No. 1 ceased to flow from its natural pressure on the 15th day of May, 1902, and ceased to flow oil by the introduction of gas derived from other sources, or the introduction of compressed air, on the 18th of July, 1902. It is undisputed that the failures here stated were without fault of the oil company. Well No. 1, however, by means of pumping produced ten thousand barrels of oil between October 9, 1902, and January 16, 1903. Of this amount 8,683 barrels were obtained between October 23, 1902, and January 16, 1903. The amount from December 23, 1902, to said January 16, being 2424 barrels. The evidence shows that about seventy barrels per day of crude oil was necessary for the operation of the Fort Worth plant, and about one hundred and twenty barrels per day for the two Waco companies. It further appears that on or about July 18, 1902, when well No. 1 had ceased to flow oil by the introduction of gas and of compressed air, J. B. Cranfill, the president of the appellant oil company, notified the appellee companies of such failure and declared a termination of the contract. But by a subsequent arrangement between the parties, alleged by the appellants to have been a new agreement, but which was denied by appellees and determined in favor of appellees' contention by the jury, oil was subsequently furnished, after the installation of pumping machinery, in certain quantities until the date of the alleged and determined breach on December 23, 1902. Oil had advanced in price from the date of the contract and the installation of pumping machinery was quite expensive. Such further statements of fact as we deem necessary will be made in connection without further determination.

It must be, as we think it is, conceded that the quoted provision of the contract is operative in behalf of the San Jacinto Oil Company, and that if there was a "failure of oil wells" within the meaning of the provision prior to October, 1902, the judgment should have been for appellants. What scope and meaning, therefore, shall be given to the terms "failure of oil wells?" We are of the opinion that the "wells" meant were those only which at the date of the contract were owned and in operation by the appellant oil company, viz.: oil wells Nos. 1 and 2. For it is undisputed that these two wells at the time of the execution of the contract were flowing large quantities of oil and there is nothing in the record that suggests that it was in the contemplation of the parties that additional wells were to be bored. Nor could it have been contemplated that the appellant oil company should go into the market and buy and sell oil from other wells in the same field. It had an abundance of oil; it was a private corporation incorporated for the purpose of sinking wells on its own property only and to sell oil, if any, thereby secured and not to engage in the business of buying and selling oil generally; and the very opening recitations of the contract plainly show that the oil wells in mind were those only then owned by the San Jacinto Oil Company. These limitations of the scope of the provision under consideration bring us to the determination of the more doubtful question of what effect shall be given the term "failure?"

Appellees insist that it is unambiguous and that no definition or meaning other than its ordinary one can be given.

The court below construed the term as meaning "a failure of the wells (Nos. 1 and 2) to provide oil in such quantities as would justify the pumping of oil therefrom at the market price, and that it was not meant by such expression a failure to flow from natural causes."

We have been unable to concur precisely either with the contention of appellees or with the application or meaning of the term failure given by the trial court. Some of the ordinary definitions of the term from the Standard Dictionary, however, will be given: 1. "The act of failing; or the state of having failed; cessation or deficiency of supply, power, etc.; 2. Neglect or noncompliance; partial or total deficiency in action; omission; noncompliance. 3. That which fails; anything done imperfectly or attempted unsuccessfully." It is undoubtedly true as a general rule that in the construction of a contract the ordinary use of its terms is to be applied. But it is not universally so, and it is sometimes a matter of great difficulty to adopt the precise shade of meaning that will best express the intent of the parties. In all rules of construction, however, the dominant purpose is to ascertain, if it be possible, what was in the minds of the parties to the contract at the time it was made. For it is elementary that it is no contract unless the parties thereto assent to the same thing in the same sense. And in the ascertainment of the meaning of the terms used the situation of the parties and of the subject matter at the time, and the acts and declarations of the parties, may be looked to. Nor is it necessary that the words to be interpreted shall be themselves ambiguous, and a party will be held to that meaning which he knew the other party to the contract supposed the words to bear. (See 2d Parsons on Contracts, 8th ed., bottom pp. 491, 617, 658.) Having in mind these and other familiar rules of construction, a majority of us have concluded that there was a failure of appellants' oil wells within the meaning of the contract, when said wells ceased to gush or produce oil by natural forces; or at least there was such failure before the installation of pumping machinery. When the cost of installing such machinery and of obtaining oil thereby is considered with other circumstances, it seems unreasonable to suppose that an agreement to furnish oil at nine cents per barrel of forty-two gallons would have been made. It seems clear that J. B. Cranfill, the president of the oil company who executed the contract for it, had no such thought. He testified, and it is undisputed, that the contracts as originally prepared did not have the provision under consideration and that he declined to execute the contract until it was embodied therein. He further testified, without dispute on the part of Mr. Scott or of anyone else so far as we have found in the record, as follows: "In discussion of the contract the main point we talked about was the clause in the contract that would be protective of the oil company in case the oil supply down there should fail. In the contract Mr. Scott said that there was no use of such a clause, because he had just been in Beaumont, had inspected the wells and that in his judgment the wells would flow for five years. My answer to that was that if they would flow for five years, then such a clause could not harm him. I agreed with him; I told him I thought they would flow a long time, but inasmuch as I was charged

with responsibility as president of the company, that I was unwilling to sign a contract that did not contain the clause protecting us against a contingency of the failure of the wells." We have found nothing in all of the findings or testimony that even suggests that the production of oil by pumping was thought of in any part of the Beaumont oil field at the time of the making of the contract, and the inference is very strong that Mr. Scott at the time understood Mr. Cranfill to mean that a failure of wells to flow by natural force was the contingency intended to be provided against. We conclude, as before stated, that such was the sense in which the terms "failure of oil wells" were used.

But if mistaken in the foregoing conclusion and applying a rule of construction insisted upon by appellees, we all think there is yet another sense in which there was a failure of oil wells as early as July 18, 1902. The evidence seems undisputed that the wells ceased the natural flow prior to July, 1902, from which time until about the 18th of that month oil in comparatively small quantities was secured by gas pressure which, to use the language of one of the witnesses "went down so suddenly on the field that none of us were prepared." The evidence then exhibits the general effort in the entire oil field to procure pumping machinery and shows great care and diligence on the part of the San Jacinto Company to do so. The agent in charge at the time testified: "To get oil out of that well (No. 1—No. 2 having entirely failed) during that time I read books and talked to every man that I could that had any idea, and I wrote and begged and pleaded, I offered money, everything on earth of an inducement I could, to get material, get pumps or anything to get oil out of the ground, night and day. . . . Between July 18 and November 1, I don't know of any appliance or means or method whereby oil could be obtained, that was used by anybody that we did not use." Notwithstanding which it was about November 1, 1902, before oil in any considerable quantity was obtained. And then only as follows, as agreed upon and as found by the court, viz.: October 9, 1902, 167 barrels. Between October 9 and October 15, 640 barrels. Between October 15 and October 17, 190½ barrels. Between October 17 and October 18, 160 barrels. Between October 18 and October 23, 160 barrels. Between October 23 and December 23, 6259 barrels, and between December 23, 1902, and January 16, 1903, 2424 barrels. Estimating the amount of oil necessary for the supply of the appellee companies at 70 barrels for the Fort Worth company, and 60 barrels each for the Waco companies, or 190 barrels of oil per day, as shown by the undisputed testimony, it conclusively appears from the above statements that there was a very substantial failure of the oil wells at and prior to the alleged breach of contract within the meaning of one of the ordinary definitions hereinbefore quoted. We think this is true whether the contracts of the appellee companies be regarded as separate and distinct or as interdependent and an entirety as we are inclined to construe them. As ordinarily defined, a failure is a "cessation or deficiency of supply," "a partial or total deficiency in action," etc. By the terms of the contract the right of the appellant oil company to terminate the contract is not limited to a total failure. The terms are "failure of oil wells." This, it seems to us, can not be construed to mean less than a substantial failure. That there was a substantial

failure, a mere mathematical calculation shows. If the appellees wished to limit the option of terminating the contract to an entire failure, and to exclude a partial or substantial failure, they should, applying one of their own contentions, have so provided. Not having done so, we think that upon substantial failure of the oil wells to supply the appellee companies or even any one of them, the appellant oil company was at liberty to terminate the contract. It conclusively appearing, as we think, that at the date of the breach urged there was in fact a substantial failure of the oil wells specified in the contract sued upon, the judgment should have been for appellants.

The judgment is reversed and here rendered for appellants accordingly.

*Reversed and rendered.*

Writ of error refused.