## TEXAS PAC. COAL & OIL CO. v. HARRIS.
### (No. 9537.)

*(Court of Civil Appeals of Texas. Fort Worth. March 19, 1921. Rehearing Denied April 16, 1921.)*

1. **Mines and minerals** ☞78(2)—**"Drilled" well in oil lease, providing therefor to avoid forfeiture, held to mean completed well.**

Lessee in an oil lease, agreeing "to drill the fourth well drilled in C. F. field on these lands or forfeit contract," would comply with his contract by completing a well on lessor's land prior to finishing a fourth one on other lands, the word "drilled" being the past participle of the verb and meaning "completed," and it would be immaterial that more than three wells had been previously started on other lands.

2. **Evidence** ☞452—**Latent ambiguity in oil lease warranting proof of intention.**

There was a latent ambiguity in an oil lease providing that lessor "drill the fourth well drilled in C. F. field on these lands or forfeit contract," and evidence was competent to show whether it was the intention of the parties that the well should be the fourth one drilled by the lessee or the fourth well drilled by any one in the field.

3. **Contracts** ☞170(1)—**Practical construction given contract to control.**

The practical construction deliberately given a contract containing a latent ambiguity by both parties should control its interpretation.

4. **Contracts** ☞147(1)—**Primary rule of construction is to ascertain intention of parties at the time.**

In all rules of construction of contracts, the dominant purpose is to ascertain, if it be possible, what was in the minds of the parties to the contract at the time it was made.

5. **Contracts** ☞15—**Assent must be to the same subject-matter.**

There is no contract unless the parties thereto assent to the same thing in the same sense.

6. **Contracts** ☞169—**Circumstances may be looked to.**

In the ascertainment of the meaning of terms used, the situation of the parties and of the subject-matter at the time and the acts and declarations of the parties may be looked to.

7. **Contracts** ☞143—**To call for construction words used need not themselves be ambiguous.**

For a contract to call for construction, it is not necessary that the words to be interpreted shall be themselves ambiguous.

8. **Contracts** ☞155—**Words construed against party using them.**

A party will be held to that meaning which he knew the other party to the contract supposed the words to bear.

---

**9. Mines and minerals ☞78(7)—Action to cancel oil lease held premature.**

An action to cancel an oil lease, by reason of lessee's failure to comply with its agreement "to drill the fourth well drilled in C. F. field on these lands or forfeit contract," was prematurely brought, where more than three wells had been started on other lands, but not more than three of them had been completed.

Appeal from District Court, Stephens County; J. R. Warren, Acting Judge.

Suit by J. C. Harris against the Texas Pacific Coal & Oil Company. Judgment for plaintiff, and defendant appeals. Reversed and remanded.

John Hancock and W. J. Oxford, both of Thurber, for appellant.

Padelford, Turner, Doyle & Bouldin, of Fort Worth, and J. W. Crudgington, of Amarillo, for appellee.

BUCK, J. This suit was filed by J. C. Harris against the Texas Pacific Coal & Oil Company to cancel a lease on certain described land owned by Harris in Stephens county. The lease contains this provision:

"Second party agrees to drill the fourth well drilled in Crystal Falls field on these lands or forfeit contract."

It was alleged by plaintiff in his original petition that the defendant agreed that the fourth well to be drilled by it in the Crystal Falls field should be drilled on plaintiff's land, or the contract should be forfeited.

The cause was tried before the court and judgment rendered for plaintiff, canceling the lease, and the defendant has appealed.

The evidence shows that plaintiff's land was situated in the northwest part of Stephens county, about ten miles west of the town of Crystal Falls, and was in what was known as the Crystal Falls Field; that the defendant's agent called on him in the summer of 1916 and told him that it intended to drill 3,500 feet for oil, and deeper if the prospects looked good; that two rigs were to be put in the field by the Texas Pacific Coal & Oil Company, hereinafter called the "T. & P. Company," and wanted to secure an oil and gas lease on plaintiff's land; that plaintiff asked him if they were going to drill for oil, and he told him that was the purpose of the company; plaintiff then offered to lease his land for $1 an acre if he would go ahead and assure him a well; that the agent said:

"I can't give you the first well, the second well, nor the third well. The best I can do is to give you the fourth well in the Crystal Falls Field."

Whereupon the contract was made with the provision hereinbefore set out, and the lease was executed by Harris. At this time no other company or person was drilling or offering to drill in this field, it being wildcat territory. The first well commenced after the execution of the lease contract was the Sloan well, in the latter part of 1916, the next was the Gaston well, commenced in the latter part of 1917, both being drilled by the T. & P. Company. The next well was the Scott well, drilled by the Prairie Oil & Gas Company, assignee of the T. & P. Company. Then the Kloh well was started by the Mid-Kansas Company, assignee of the T. & P. Company. The next well was the second Sloan well, drilled by the Sin Clair Company, assignee of appellant. The next well was spudded in and was in process of drilling on the land of the plaintiff at the time of the suit. Other wells were started and some completed by other companies, and on land on which the T. & P. Company had no leases, but the trial court seems to have predicated his judgment on the fact that defendant and its assignees did not drill the fourth well on plaintiff's land.

Plaintiff testified:

"The wells that were being drilled at the time I claimed forfeiture were the Gaston, the first Sloan well, the Scott well, and the Kloh well. These are the wells that I claim authorized me to forfeit the lease."

This testimony, taken in connection with the fact that in his original petition he charged that the defendant had agreed that the fourth well to be drilled by it in the Crystal Falls field should be drilled on plaintiff's land, we think sufficiently establishes the fact that plaintiff and defendant at the time the contract was made did not have in mind wells to be drilled by other companies or persons on lands not held under lease or owned by the defendant company. It is true that plaintiff''s attorney testified that plaintiff was not responsible for the language used in the original petition, and that he prepared the petition without any consultation at all with the plaintiff; that either he, the attorney, or his stenographer, happened to get the words "by the defendant" in there; that plaintiff was not to blame for the use of such language and did not have anything to do with it. But, at any rate, on plaintiff's own testimony, we are authorized to exclude from consideration the wells drilled on lands other than those under lease by the T. & P. Company.

[1] The evidence shows that the appellant paid appellee $179.50 as a down payment for said lease, and $718.50 annually for the years 1917, 1918, and 1919, all of which payments were accepted and retained by appellee; that the rental for the year ending August 5, 1920, was tendered in May, 1919, but was refused; that the Sloan well was drilled to a depth of 3,464 feet and no oil was found; that the Gaston well was drilled to a depth of 4,550 feet with no oil; that the Scott well, drilled

---

by the Prairie Oil & Gas Company under an assignment from the T. & P. Company, was started in January, 1918, and was being drilled at the time of the trial; that the Kloh well was begun March 8, 1919, by the Mid-Kansas Company, under an assignment from the T. & P. Company, and was being drilled at the time of the trial; that on May 16, 1919, a derrick was built on appellee's land and drilling was commenced in October following; that in July, 1919, drilling was commenced on the Stoker well by the Mid-Kansas Company, under an assignment from the T. & P. Company, which well was being drilled at the time of the trial; that in October, 1919, drilling was commenced on the Sloan well No. 2, by the Sin Clair Company, under an assignment from the T. & P. Company, and this well was in process of drilling at the time of the trial. Hence, it is not shown that either the T. & P. Company or its assignees had drilled to completion four wells before it spudded in the well on plaintiff's land. The evidence does not show which one of the wells in process of drilling at the time of the trial would be completed first, or that the well on plaintiff's land would not be drilled as the fourth well on lands under lease by the T. & P. Company, even though some of the wells were on lands assigned by the T. & P. Company to other companies. It will be remembered that the stipulation upon which plaintiff relied for his attempted forfeiture provided that there should be drilled on his land "the fourth well drilled in Crystal Falls field," or the contract should be forfeited. "Drilled" is the past participle of the verb and means "completed." It is a well-known fact that many wells are started and by reason of loss of bits in them, or for other reasons, are abandoned before they can be said to be "drilled" wells, or completed wells. We are of the opinion that plaintiff's suit was prematurely brought, and that, in any event, before he would be entitled to a judgment, he would have to show that more than four wells were drilled by the defendant company, or by its assignees in the Crystal Falls field, before a well was drilled on his land.

H. A. Sperry, general manager of appellant company testified:

"As general manager for the Texas Pacific Coal & Oil Company, will state said company construed the provision in the lease under which it holds to mean the fourth well drilled by this company, and so understanding and construing the same has acted accordingly."

[2, 3] Without determining whether the provision should be held to include wells drilled by assignees of the T. & P. Company, we do hold that there is a latent ambiguity in the language used, and that parties to the transaction appear to have construed the language, at least, so as to exclude from consideration wells drilled by companies or persons other than the T. & P. Company, and on land not under lease by it. As said by the Supreme Court in the case of Ry. Co. v. Johnson, 74 Tex. 263, 11 S. W. 1116, with reference to construing a contract:

"The practical construction deliberately given it by both parties should control its interpretation."

Also in Ry. Co. v. Adams, 87 Tex. 131, 26 S. W. 1042, it is said:

"In construing contracts of doubtful meaning, the practical construction of the parties to them may be considered. The construction given by Belknap * * * was decidedly against his own interest, and would be entitled to great weight in interpreting the instrument."

[4-8] As said by Chief Justice Conner of this court, in the case of San Jacinto Oil Co. v. Light & Power Co., 41 Tex. Civ. App. 293, 93 S. W. 173:

"It is undoubtedly true as a general rule that in the construction of a contract the ordinary use of its terms is to be applied. But it is not universally so, and it is sometimes a matter of great difficulty to adopt the precise shade of meaning that will best express the intent of the parties. In all rules of construction, however, the dominant purpose is to ascertain, if it be possible, what was in the minds of the parties to the contract at the time it was made. For it is elementary that it is no contract unless the parties thereto assent to the same thing in the same sense. And in the ascertainment of the meaning of the terms used, the situation of the parties and of the subject-matter at the time and the acts and declarations of the parties may be looked to. Nor is it necessary that the words to be interpreted shall be themselves ambiguous, and a party will be held to that meaning which he knew the other party to the contract supposed the words to bear."

In Decker v. Kirlicks, 216 S. W. 385, our Supreme Court, speaking through Chief Justice Phillips, says:

"If the provision is ambiguous, that alone condemns it as a forfeiture provision. A forfeiture should rest upon surer grounds. Where a contract is so vague in its terms that a court cannot determine its meaning, it would be unjust to enforce a forfeiture under it against one whose only fault has been to possibly mistake its meaning. Forfeitures are harsh and punitive in their operation. They are not favored by the law, and ought not to be. The authority to forfeit a vested right to an estate should not rest in provisions whose meaning is uncertain and obscure. It should be found only in language which is plain and clear, whose unequivocal character may render its exercise fair and rightful."

In Dublin Electric & Gas Co. v. Thompson, 166 S. W. 113, Thompson sued the defendant to recover damages for the destruction of his house by fire, alleging a contract with the company "for water for all purposes." He testified that at the time of the contract:

"I didn't have my mind on fire. I didn't know but what it was for fire."

The manager of the company testified:

"I have no authority to make contracts for fire protection. It was not on my mind at the time to do it."

The trial court gave to said contract its broadest meaning and rendered judgment for Thompson. This court, speaking through Chief Justice Conner, held that regardless of whether or not the agent of the company had authority to make the contract, the judgment for Thompson should be reversed and judgment rendered in favor of the company. There the court says:

"While as a general rule the terms of a contract are to be given their full effect and meaning, yet the ruling object is to ascertain the intention of the parties, and hence their situation, the subject-matter, and other circumstances, may be looked to in determining the meaning of the terms used, although the terms are not in themselves ambiguous, and a party will be bound by that meaning which he knew the other party to the contract supposed the words to bear. * * * It seems evident to us that the purposes of the parties in mind at the time was that water was to be furnished for all ordinary domestic purposes, and that it was not intended as an agreement that water should be furnished for extraordinary purposes."

See, also, San Jacinto Oil Co. v. Light & Power Co., 41 Tex. Civ. App. 293, 93 S. W. 173, writ of error denied.

[9] We mention these authorities as indicating the trend of our courts in the construction of contractual provisions couched in ambiguous language either patent or latent; but we rest our decision that the judgment of the trial court should be reversed on the ground that the suit was prematurely brought.

The judgment below will be reversed, and the cause remanded.