## IOWA CANNING CO. v. F. S. AINSA CO., Inc.    (No. 1663.)

(Court of Civil Appeals of Texas. El Paso. Nov. 6, 1924. Rehearing Denied Dec. 31, 1924.)

1. **Customs and usages ⬥17—Parol evidence of custom, changing plain meaning of instrument, not admissible.**

Where instrument is clearly unambiguous, and intention and meaning of parties can be ascertained from writing itself, parol evidence cannot be received of a custom or usage which will change plain meaning of words or phrases used in instrument, or give it a meaning different from their natural import, or to discover its meaning.

2. **Customs and usages ⬥17—Custom never admissible to vary what is plainly stated in contract.**

Custom is never admissible or read into a written instrument to contradict what is there plainly stated, especially where parties have expressly or by necessary implication excluded a custom or usage of trade.

3. **Customs and usages ⬥17—Parol evidence of custom and usage to vary contract for sale of corn held not admissible.**

Contract for sale of cans of corn at a stipulated price per dozen cans, stating that "price was guaranteed against seller's own decline" to a day certain, could not be varied by parol evidence to show that by custom and usage such expression was generally understood to mean "price guaranteed against a general market decline," where contract mentioned no custom, usage, or rule of brokers or the trade, and was not made in reference thereto.

4. **Sales ⬥77(1)—Contract for sale of corn stating that "price was guaranteed against seller's own decline" construed.**

Contract for sale of cans of corn at a stipulated price per dozen cans, stating that "price was guaranteed against seller's own decline," guaranteed stipulated price against seller's own decline, as distinguished from a general market decline.

5. **Brokers ⬥92—Not ordinarily bound to advise as to meaning of contract prepared by principal.**

Ordinarily duties of a broker are merely those of a negotiator, on whom it is not incumbent to direct or advise as to terms of contract prepared by principal, or to explain meaning of words used.

6. **Sales ⬥87(3)—Letter held not to show that parties intended to stipulate against a general market decline.**

Letter written after making contract for sale of cans of corn at a stipulated price per dozen cans, in which "price was guaranteed against seller's own decline" to a day certain, stating that seller declined to make any concession from price named, *held* not to show

that parties intended that stipulated price was to be guaranteed against a general market decline.

Appeal from El Paso County Court at Law; J. M. Deaver, Judge.

Action by the Iowa Canning Company against the F. S. Ainsa Company, Inc. Judgment for defendant, and plaintiff appeals. Reversed and rendered.

Lea, McGrady, Thomason & Edwards, and Louis A. Scott, all of El Paso, for appellant.

A. W. Norcop, of El Paso, and J. M. Harris, of Snyder, for appellee.

WALTHALL, J. Appellant, Iowa Canning Company, plaintiff below, sued appellee, F. S. Ainsa Company, for $450 damage alleged to have been sustained by plaintiff by reason of defendant's breach of contract to purchase from plaintiff 460 cases of canned corn, pursuant to written contract between them, executed about August 12, 1920, which contract provided for the sale of such corn at the rate of $1.30 per dozen cans, with "price guaranteed against seller's own decline to October 1, 1920."

Defendant pleaded, in effect, that the phrase "price guaranteed against seller's own decline to October 1, 1920" according to custom and usage had a definite and fixed meaning in the trade, which was that the buyer would be protected against a general market decline occurring prior to delivery, and that, if the above-quoted phrase did not have such meaning according to custom and usage in the trade, then defendant believed and understood it to have such meaning, and, if it had no such meaning, then there was no contract between the parties, because there was no meeting of minds on the terms thereof. Defendant further pleaded that, if such phrase did not have such meaning contended for by it, then plaintiff, through its broker and agent at the time of the negotiations leading up to the execution of the contract of sale, represented to defendant that the phrase did have such meaning; that defendant believed it to have such meaning, and was induced to execute the contract under such belief on his part, and, by reason of the representations of plaintiff's broker, and, for reasons stated, defendant is not bound.

Defendant further pleaded that both parties to the contract, at the time of its execution, understood said phrase to have the meaning contended for by it, and that if, in law, it did not, the contract should be reformed to express the intention of the parties.

Based on a verdict of the jury in response to special issues, the court rendered judgment that plaintiff take nothing, from which judgment plaintiff has appealed.

⬥For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

Opinion.

Appellant presents two propositions. The first is to the effect that the evidence showing the contract in writing as alleged, the price of the corn as alleged, the terms of the contract clear and unambiguous, the repudiation of the contract by refusal to accept the corn at the price stated in the contract, the decline in the market price of the corn thus definitely fixing the loss and consequent damage to appellant, it was reversible error to render judgment for appellee.

The second proposition submits that the expression in the written contract "price guaranteed against seller's own decline to October 1, 1920," being unambiguous, clear, precise, and unmistakable as to its wording, it was reversible error to permit the introduction of parol evidence of a custom and usage to the effect that such expression in the contract, as above quoted, was considered by the trade to mean "price guaranteed against a general market decline to October 1, 1920," or words of similar import.

The material issues tendered in the pleadings of the parties are substantially as above stated. On special issues submitted and the evidence, the jury found that the market price of the corn had declined to 85 cents per dozen cans, on the dates named; the phrase, "price guaranteed against seller's own decline" as used in the contract, is commonly and generally understood among the trade to mean "price guaranteed against a general market decline"; the meaning, as above, was understood by and between the broker making the sale for appellant and F. S. Ainsa, representing appellee, at the time of signing the contract; Ainsa relied upon such meaning in executing the contract; there was a general market decline in price of the corn on or before October 1, 1920.

All of the above findings are sufficiently sustained by the evidence. The only question to be determined here, as complained of in the propositions, is whether the trial court was in error in hearing parol evidence to show that by custom and usage the expression "price guaranteed against seller's own decline" was commonly and generally understood among the trade to mean "price guaranteed against a general market decline." The court, over objection of appellant, heard evidence of such custom and usage from several merchandise brokers. Appellant refers to a large number of cases to sustain its contention that, while parol evidence of custom and usage may be shown to explain or aid in the interpretation of a written contract where it is incomplete or ambiguous, it is not admissible to contradict, restrict, or enlarge what requires no explanation, or to vary or control language deliberately used by parties in a written instrument. The contract, in the use of the expression in question, is not incomplete, nor is it ambiguous. The contract was not written by the broker who made the sale of the corn to appellee, but it was written by appellant and sent to the broker for delivery to appellee for approval and signature. True, there was a conversation between F. S. Ainsa, the representative of appellee, and the broker making the sale, as to the expression in question in the contract, in which conversation the meaning of the expression was discussed. Ainsa testified that, when he looked at the contract when it was handed to him by the broker, "he saw it read different to what I expected." He further testified that he did not know the canner (appellant), but that the broker assured him that the expression used meant a "general decline by all canners," and that the broker assured him that he "would stand by that" (meaning the broker would stand by the interpretation he, the broker, had placed upon the contract), and that all he, Ainsa, wanted from the broker was an assurance to that effect, and that the broker gave it (such assurance) to him. Ainsa further testified that he would not have signed the contract except for the "general understood meaning of that term, together with his (the broker's) representations to me that this (appellant) was a reliable concern." Appellant refused to ship the corn on a price reduced from the price stated in the contract, and appellee refused to accept the corn at the price stated in contract.

Now, we have not before us a contract, made between the appellee and the broker, for himself or for appellant, in which the terms used were discussed and the meaning agreed upon as between themselves. The contract was made by the parties themselves. The broker here is in no way a party to the contract, a mere middleman, the extent of whose employment, under the evidence, was to bring the parties together where they make their own bargain.

[1, 2] The application of custom and usage used here as synonymous terms, as applied to written instruments between parties, have often been before the courts here and elsewhere. The primary purpose in permitting parol evidence of a custom, when the construction of a written instrument is involved, is to enable the court to arrive at the real meaning and intention of the parties, where this cannot be ascertained by the terms of the instrument itself. Where the instrument is clearly unambiguous, and the intention and meaning of the parties can be ascertained from the writing itself, parol evidence cannot be received of a custom or usage which will change the plain meaning of the words or phrase used in the instrument, or give it a meaning different from their natural import, or to discover its meaning. The office of the usage is to interpret the otherwise indeterminate meaning of the

words used so as to fix and explain their doubtful meaning. Custom is never admissible, or read into a written instrument, to contradict what is there plainly stated, and especially would that be so where the parties have expressly, or by necessary implication excluded a custom or usage of trade.

We think the above is clearly sustained by the following authorities: First Nat. Bank v. Lancashire Ins. Co., 62 Tex. 461; Harrell v. Zimpleman, 66 Tex. 292, 17 S. W. 478; Freeman v. Morrow (Tex. Civ. App.) 156 S. W. 284, in which a writ of error was refused; Planters' Oil Co. et al. v. Greshan (Tex. Civ. App.) 202 S. W. 145; R. R. Co. v. Fagan, 72 Tex. 127, 9 S. W. 749, 2 L. R. A. 75, 13 Am. St. Rep. 776; American Warehouse Co. v. Ray (Tex. Civ. App.) 150 S. W. 763; Orient Mutual Ins. Co. v. Wright, 1 Wall. 456, 17 L. Ed. 505; 1 Greenleaf, Ev. § 292; 2 Pars. Con. 59; Bliven v. N. E. Screw Co., 23 How. (64 U. S.) 431, 16 L. Ed. 513.

The contract before us mentions no custom, usage, or rule of brokers or the trade, and, so far as the evidence discloses, except such as was discussed between Ainsa and the broker at the time the broker presented the written contract to Ainsa for signature, and of which discussion or assurance on the part of the broker, or the interpretation of the phrase under discussion by the broker, appellant seems not to have been informed, and, so far as it otherwise appears, the contract was not made with reference to any custom, usage, rule of brokers or the trade, in contemplation.

[3, 4] Appellee submits several quotations from authorities, to the effect that parol evidence is admissible where intention or meaning of the parties, or the situation or circumstances under which the written instrument was executed, or where there is some collateral matter that would explain a latent ambiguity in the instrument, or words of a technical meaning, is involved, or words peculiar to a particular trade, when such words are used in the writing. It occurs to us that the simple fact that the seller was selling cans of corn at a stipulated price per dozen cans, and the proposed term of sale was subject to acceptance, where the written proposition of the seller to the buyer stated "price guaranteed against seller's own decline" to a day certain, and the buyer with full knowledge of the price the seller guaranteed in the proposition, and the buyer accepted the proposition and executed the contract as proposed, such facts and circumstances would not make applicable, as we understand them, any of the authorities referred to by appellee. It seems clear that appellant in the written instrument guaranteed the stipulated price against its own decline as distinguished from a general market decline. It would extend this opinion to an unreasonable length to review in detail all the authorities to which we are referred by appellee. In San Jacinto Oil Co. v. Fort Worth L. & P. Co., 41 Tex. Civ. App. 293, 93 S. W. 173, referred to by appellee, in which the oil company by a written contract had agreed to supply oil, the standard of oil furnished during the 30-day test to be maintained throughout the contract period, the flow apparently then being produced by natural forces thereby inducing the parties to the contract to believe that the wells would flow as stated, for several years, but, as a precaution, provided that the contract was voidable in case "of failure of oil wells," already in operation, it was held that the "failure of the wells" to flow by natural forces constituted such "failure of oil wells" as to render the contract voidable.

In ascertaining the meaning of the clauses above quoted in the contract, the court held that, in ascertaining the meaning of the terms used in the contract, the dominant purpose is to ascertain what was in the minds of the parties at the time the contract was made. The situation of the parties, the subject-matter at the time, and the acts and declarations of the parties may be looked to, and that to do so the words to be interpreted need not themselves be ambiguous, and the parties will be held to that meaning which he knew the other party to the contract supposed the words to bear, and referred to 2 Parsons on Contracts (8th Ed.) pp. 491, 617, and 658. The opinion quotes the discussion of the parties to the contract at the time of its execution, and concludes therefrom that the construction of the contract as stated was the sense in which the terms "failure of oil wells" were used. In fact one of the parties would not sign the contract as prepared until it had written in the avoidance clause as above. But we have no such condition here. That case does not involve the evidence of custom, or use of terms in trade; nor have we the parties themselves discussing the meaning of the term used in the contract, so that we may know the parties did not assent to the same construction of the clause in question in the same sense. We have carefully reviewed the references given us by appellee, and have concluded they do not change or modify the principles above announced. The appellee may have been assured by the broker, as stated by Ainsa, that the general market decline would govern the action of appellant as to price, but such assurance was not brought to the attention of appellant so as to make the general market decline the intention and meaning of the parties. Such assurance of the broker, as we view it, was directly contradictory to the terms of the contract as prepared by the principal, and both Ainsa and the broker so understood it, as Ainsa testified he would not have signed the contract but for the assurance of the broker as to what appellant would do in the event of a general market decline.

[5] It will be observed that the assurance

of the broker as stated by Ainsa was as to what appellant would do in the event of a general market decline, rather than the meaning of the contract as written. Ordinarily, the duties of a broker are merely those of a negotiator, upon whom it is not incumbent to direct or advise as to terms of the contract prepared by the principal, or to explain the meaning of words used. R. C. L. vol. 4, p. 269; Sibbald v. Bethlehem Iron Co., 83 N. Y. 378, 38 Am. Rep. 441; 93 Am. Dec. 172, note. In the absence of an enlarged authority by the principal, the general rule is that the extent of the duty of the broker is merely to find the purchaser.

[6] Appellee refers us to a letter of appellant of October 8, 1920, and insists that in the letter appellant placed the construction on the contract contended for by appellee. We do not so construe the letter. The letter purports to be an answer to a letter written to appellant by appellee of date October 1, 1920, but we have not found appellee's letter in the record. The letter was written after the contract was made, and states that appellant declines to make any concession from the price named, and gives the reasons therefor.

For reasons stated the case is reversed and here rendered for appellant in the sum of $414, with interest on said amount at the rate of 6 per cent. per annum from the 1st day of December, 1920.