**KENT v. RYAN et al. (No. 822.)**

Court of Civil Appeals of Texas. Waco. Oct. 3, 1929.

Rehearing Denied Oct. 31, 1929.

W. A. Tarver, of Austin, and Lawrence Treadwell, of Corsicana, for appellant.

Richard & A. P. Mays, of Corsicana, for appellees.

GALLAGHER, C. J. This suit was instituted by appellant, G. C. Kent, against appellee George R. Ryan, to cancel an oil and gas lease held by appellee on 106.5 acres of land, and to remove the cloud cast thereby on appellant's title to said land. Appellant further prayed that he be quieted in his title and possession of said land and the minerals therein and thereunder. Certain remote grantors in the chain of title under which appellee claimed said lease were also made parties defendant.

J. C. Harper and wife, on May 14, 1919, executed and delivered to Paulsen-Highnote Oil & Gas Company an oil and gas lease on the tract of land involved in this suit. Said oil and gas company held at that time a prior oil and gas lease on said tract of land, and

said Harper held the same subject thereto. Seven or eight shallow wells had theretofore been drilled on said land and oil discovered therein. Several or all of said wells were being operated at that time by said oil and gas company, and royalties on the oil produced therefrom were being paid to said Harper as they accrued. The average daily production of oil from said wells at that time is not shown, but at a later date the average production from each well operated is shown to have been 1 or 2 barrels per day. On said 14th day of May, 1919, a representative of said oil and gas company presented to said Harper and wife the mineral lease under which appellee now claims, and stated that said company needed a new lease to "straighten their business out." Harper testified that his attorney was out of town, and that he did not have an opportunity to advise with him about signing said lease. He further testified that nothing was said about drilling any further wells on said land; that he did not require any further wells to be drilled; and that said representative did not give any assurance or make any promise that other wells would be drilled. He did testify, however, that something was said at the time about "deep oil." There was testimony that a "leasing campaign" was on in that territory at that time. Said lease, omitting immaterial paragraphs, is as follows:

"Oil and Gas Lease—Form 88.

"Agreement, Made and entered into the 14th day of May, 1919, by and between J. C. Harper and wife Mrs. Altie Harper, hereinafter called Lessor (whether one or more), and Paulson-Highnote Oil & Gas Co., hereinafter called Lessee:

"Witnesseth: That the said Lessor, for and in consideration of One Dollars, cash in hand paid, receipt of which is hereby acknowledged, and of the covenants and agreements hereinafter contained on the part of the lessee to be paid, kept and performed, have granted, demised, leased and let, and by these presents do grant, demise, lease and let unto the said Lessee for the sole and only purpose of mining and operating for oil and gas, and of laying pipe lines, and of building tanks, towers, stations and structure thereon to produce, save and take care of said products, all that certain tract of land situated in the County of Navarro, State of Texas, described as follows, to-wit: * * * (Fieldnotes omitted.)

"It is agreed that this lease shall remain in force for a term of five years from this date, and as long thereafter as oil or gas, or either of them, is produced from said land by the lessee.

"In consideration of the premises, the said lessee covenants and agrees:

"1st. To deliver to the credit of the Lessor, free of cost, in the pipe line to which he may connect ―――― wells, the equal one-eighth part of all oil produced and saved from the leased premises.

"2nd. To pay the Lessor one-eighth royalty, each year, in advance, for the gas from each well where gas only is found, while the same is being used off the premises, and the Lessor to have gas free of cost from any such well for ―――― stoves and ―――― inside lights in the principal dwelling house on said land during the same time by making their own connections with the well at their own risk and expense.

"3rd. To pay Lessor for gas produced from any oil well and used off the premises at the rate of one-eighth royalty, per year, for the time during which such gas shall be used, said payments to be made each three months in advance. Also to pay Lessor one-eighth of the net proceeds derived from the sale of casing-head gas utilized in making gasoline.

"If no well be commenced on said land on or before the ―――― day of ――――, 191-, this lease shall terminate as to both parties, unless the Lessee on or before that date 'shall pay or tender to the Lessor, or to the Lessor's credit in the ―――― Bank at ―――― or its successors which shall continue as the depository regardless of all changes in the ownership of said land, the sum of ―――― Dollars, which shall operate as a rental and cover the privileges of deferring the commencing of a well for ―――― months from said date. In like manner and upon like payments, or tenders, the commencement of a well may be further deferred for like periods of the same number of months successively. And it is understood and agreed that the consideration first recited herein, the down payment, covers not only the privilege granted to the date when said first rental is payable, as aforesaid, but also the Lessee's option of extending that period as aforesaid, and any and all other rights conferred.

"Should the first well drilled on the above described land be a dry hole, then, and in that event, if a second well is not commenced on said land within twelve months from the expiration of the last rental period for which rental has been paid, this lease shall terminate as to both parties unless the Lessee on or before the expiration of said twelve months shall resume the payment of rentals in the same manner as hereinbefore provided. And it is agreed that upon the resumption of the payment of rentals as above provided, that the last preceding paragraph hereof, governing the payment of rentals and the effect thereof, shall continue in force just as though there had been no interruption in the rental payments.

"If said Lessor owns a less interest in the above described land than the entire and undivided fee-simple estate therein, then the royalties and rentals herein provided for shall be paid the said Lessor only in the proportion which ―――― interest bears to the whole and undivided fee.

"Lessee shall have the right to use, free of cost, oil and water produced on said land for ——— operations thereon, except water from wells of Lessor.

"When requested by Lessor, Lessee shall bury ——— pipe line below plow depth.

"No well shall be drilled nearer than 200 feet to the house or barn now on said premises, without the written consent of Lessor.

"Lessee shall have the right of ingress and egress to said premises at all times during the life of this lease.

"Lessee shall pay for all damages caused by operations to growing crops on said land.

"Lessee shall have the right at any time to remove all machinery and fixtures placed on said premises, including the right to draw and remove casing. * * * (Assignment and warranty clauses omitted.)

"In Testimony Whereof, we sign this the 14th day of May, A. D. 1919.

"J. C. Harper,
"Mrs. Altie Harper."

Appellee bases the claims asserted by him in this suit solely on said new lease. Said Paulsen-Highnote Oil & Gas Company continued to operate said shallow wells, paying the royalties accruing from such operation to the said Harper, until July 15, 1920, when it assigned said lease to another. Appellee claims under an assignment of said lease to him, dated December 13, 1924. Said assignment was the seventh successive assignment thereof. Said assignment to appellee was more than five years after the date of said lease.

Harper and wife, on December 22, 1921, executed a deed of trust on said land to secure large sums of money owed by him to the First State Bank of Hillsboro. On January 11, 1923, they conveyed all the minerals in and under said land to said bank. There is testimony tending to show that this conveyance was intended as a mortgage to better secure said indebtedness. The trustee in said deed of trust, on September 4, 1925, sold said land to satisfy said indebtedness, and said bank became the purchaser at said sale and received a deed to said land from the trustee. Appellee purchased said land from said bank on February 18, 1927. He testified that the consideration for the sale of said land to him was $9,000. He further testified that he bought said land in good faith, believing that said mineral lease had expired, and that he acquired by such purchase a fee-simple title to both the surface of the land and the minerals in and under the same. He further testified that the value of the land exclusive of minerals was $1,000, and that the value of the minerals in and under the same was estimated by him at the sum of $8,000 in such purchase.

None of the successive holders of said lease ever drilled any well or wells to further develop the same and increase the production therefrom. Neither Harper nor said bank ever requested the drilling of such additional wells. During all said years the respective holders of said lease paid the stipulated royalties arising from the operation of said old wells to Harper or to said bank. Two such payments were made by appellee at the office of appellant after appellant purchased the land. Shortly after said lease was assigned to appellee he had a conversation with Harper with reference to the operation of said wells, and Harper stated to him that he was satisfied with the manner in which the same were being operated. Appellee testified that he told Harper at the time that he "wanted to go ahead and put this lease in shape," and that Harper said such action would be satisfactory to him. Appellee had a similar conversation with a representative of said bank. Shortly thereafter appellee expended about $2,700 in repairing and improving the machinery and appliances used in operating said wells. Other facts will be stated in connection with the issues of law discussed in this opinion.

The case was tried to the court and judgment rendered that appellant take nothing by his suit, and that appellee be quieted in his ownership, title, and possession of the mineral estate in and under said land, less a one-eighth royalty interest therein. Hence this appeal.

## Opinion.

 The trial court found that the lease under consideration contained no provision for the drilling of wells and was given for operating purposes only, and that as oil and gas had since the execution thereof been continuously produced from the land covered thereby, and were still being produced therefrom, said lease, according to its own terms, had not expired, but was still in full force and effect and would so remain as long as oil and gas were produced therefrom. Upon said findings, and others not necessary to recite, the court rendered judgment not only refusing appellant a cancellation of said lease, but in general and unrestricted terms quieting appellee in his ownership, title, and possession of the mineral estate in said land, subject only to one-eighth royalty interest therein. Appellant by various propositions assails the judgment rendered and the material findings upon which the court predicated the same. It will not be necessary to discuss said propositions separately. Written contracts should be construed as a whole and in the light of the situation at the time and the circumstances attending their execution. Haldeman v. Chambers, 19 Tex. 1, 46; Lipscomb v. Fuqua, 103 Tex. 585, 590, 131 S. W. 1061; Barber v. Herring (Tex. Com. App.) 229 S. W. 472, 474, par. 2; San Jacinto Oil Co. v. Fort Worth Light & Power Co., 41 Tex. Civ. App. 293, 93 S. W. 173, 176 (writ refused); Texas Pacific Coal & Oil Co. v. Harris (Tex. Civ. App.) 230 S. W. 237, 239. Where there is a latent ambiguity, as in the contract here un-

der consideration, the court may look to the construction which the parties have placed upon it by their acts and declarations to ascertain its true meaning. G. H. & S. A. Ry. Co. v. Johnson, 74 Tex. 256, 263, 11 S. W. 1113; E. H. Perry & Co. v. Langbehn, 113 Tex. 72, 80, 252 S. W. 472, and authorities there cited; Cleburne Water, Ice & Lighting Co. v. City of Cleburne, 13 Tex. Civ. App. 141, 35 S. W. 733, 735 (writ refused); Rowles v. Hadden (Tex. Civ. App.) 210 S. W. 251, 257, 258, par. 1; Texas Pacific Coal & Oil Co. v. Harris, supra, page 239, par. 3. Such rules, however, do not permit disregard or violation of the express language which the parties have employed in defining their obligations. Southern Gas & Gasoline Engine Co. v. Richolson (Tex. Com. App.) 216 S. W. 158, 159, par. 1.

The grantee in the lease under consideration held at the time he took the same a prior lease on said tract of land. The validity thereof does not appear to have been questioned. Such prior lease was abandoned and the new lease accepted by all parties in lieu thereof and as a complete substitute therefor. The production at that time was from shallow wells exclusively and was trivial in quantity. Said prior lease provided for the payment of royalties according to the production from each well respectively, at the rate of one-eighth of all oil from wells producing not more than 10 barrels per day, one-sixth of all oil from wells producing not more than 15 barrels per day, and one-fourth of all oil from wells producing more than 15 barrels per day. No one of said wells was yielding as much as 10 barrels per day. The more onerous royalty provisions of such prior lease were wholly immaterial, if the continued operation of the shallow wells then in existence was all that was contemplated. There was testimony that said wells had been drilled years before. There was also testimony tending to show that the operation of said wells was attended with little, if any, profit to the lessee. There is nothing to indicate that an extension of the shallow well system was contemplated at the time the new lease was taken, nor that such was the purpose of the grantee in procuring such new lease. Harper acquired title to said land long after the date of said original lease. He testified that he did not know that he was entitled thereunder to receive increased royalties in case of increased production at the time he executed the new lease. It was a matter of common knowledge at that time that many deep wells had theretofore been drilled in Navarro and other counties in this state, and that some of such wells had yielded or were yielding several thousand barrels of oil each per day. A change in the royalty provisions was of vital importance if deep wells should be drilled on said land and such quantities of oil produced therefrom. There was a leasing campaign on in that territory at the time. Harper testified at the trial that the representative of the grantee said something about "deep oil" at the time this new lease was taken, but that he did not remember just what was said in that connection. He admitted, however, that he testified in a deposition theretofore taken, as follows: "They told me that they were going to drill for deep oil when I renewed this lease." Such was the condition of the subject-matter and the situation of the parties at the time the lease under consideration was executed.

We may now proceed to the consideration of the terms of said lease. It is declared therein that the premises are granted to the lessee "for the sole and only purpose of mining and operating for oil and gas, and of laying pipe lines and of building tanks, towers, stations and structure ducts thereon to produce, save and take care of said products." The consideration therefor is declared to be $1, and the covenants and agreements therein to be paid, kept, and performed by the lessee. The covenants and agreements so referred to are set out specifically and numbered seriatim. They are, in substance, as follows:

(1) To pay or deliver to the lessor free of cost on his part, one-eighth of all the oil produced.

(2) To pay lessor a one-eighth royalty for all gas from wells where gas only is found and used off the premises; also to allow lessor free gas for certain purposes.

(3) To pay lessor one-eighth royalty on gas produced from any oil well and used off the premises; also to pay lessor one-eighth of the net proceeds derived from the sale of casing head gas used in making gasoline.

Said lease contains further stipulations that the lessor shall have the right to use free of cost oil and water produced by it on said land for "operations"; that no well shall be drilled nearer than 200 feet from the house or barn; and that the lessor shall have the right at any time to remove all machinery and fixtures placed on said premises.

■ Said lease also provides that the same shall remain in force for a term of five years from its date, and so long thereafter as oil or gas or either of them is produced from said land by the lessee. Said lease contains nothing whatever to indicate that the lessee was then in possession of the premises and producing oil therefrom. No gas was being produced on said premises, and there is no testimony that any had been found thereon. The finding of the trial court that gas as well as oil was being produced at that time is without support in the testimony and was evidently the result of inadvertence.

Said lease was executed on a printed form and contained what is commonly called an "unless" forfeiture or termination clause, but the same was rendered ineffective by a failure to fill essential blanks therein. The purpose of such clauses is to secure prompt development of the leased premises on the part

of the lessee by drilling within the time specially limited, or in the alternative the payment of a stipulated rental in lieu thereof. The failure to do either works an immediate forfeiture or termination of the lease, notwithstanding the fixed term of duration has not expired. The failure of the parties to this lease to fill the essential blanks in said clause so as to vitalize it and render it effective left the fixed term of five years absolute and deprived the lessor of any right during such term to forfeit the lease or treat the same as terminated for such failure to develop. Texas Oil & Gas (Thuss), p. 64, § 41; Summers' Oil & Gas, pp. 505 et seq., § 161, and authorities there cited.

The rights of the lessee under said lease in the mineral estate in said land continued, according to the provisions thereof, during the entire period of the fixed term of five years, regardless of whether there was production or not, and regardless of any attempt on the part of the lessee to secure such production. Such rights terminated, however, on the expiration of said fixed term of five years unless oil or gas was, within the meaning of the duration clause of said lease, then being produced from said premises by the lessee. Thuss on Oil & Gas, pp. 75–80, §§ 53, 54, and 55, and authorities there cited.

■ It is true, as found by the trial court, that said lease contained no express agreement on the part of the lessee to drill wells for the discovery and production of either oil or gas, but such drilling was, we think, clearly contemplated, and the right to drill conferred by the terms thereof, especially when construed in the light of the circumstances attending its execution. On the other hand, said lease not only contained no express provision authorizing or requiring the lessee to operate the few shallow wells then on the premises, but such lease contained no reference whatever to the same. So far as the terms of said lease are concerned, said wells and the trivial production therefrom were wholly ignored. The lessee's right to continue the operation of such wells arose merely by implication from the terms of such lease when construed in connection with the condition of the subject-matter thereof as disclosed by extraneous evidence.

The trial court found that said new lease "was given for operating purposes only." We understand from said finding that the court was of the opinion that the sole purpose of the execution, delivery, and acceptance of the new lease by the parties thereto was to authorize the lessee to continue to operate the old wells then on said land. We think such finding is without support in the evidence. Since the judgment of the trial court is predicated thereon, it will be reversed.

■ We are of the opinion, however, as heretofore indicated, that there is a latent ambiguity in the provision of the lease with reference to its continuation after the expiration of the initial or fixed period of five years. Said provision is that such lease shall remain in force "as long thereafter as oil or gas, or either of them, is produced from said land by the lessee." The issue is whether it was the intention of the parties to said instrument at the time that the continued operation of said old wells alone should constitute production of oil from said premises by the lessee, within the meaning of said provision, and thereby continue the rights of the lessee or his assigns therein so long as the same should continue.

In addition to the parol testimony pertaining to said issue heretofore recited, there was also testimony that after May 14, 1924, the date of the expiration of the five-year term, the assignee of the lease then in possession of the premises thereunder continued as before the operation of said wells and the payment of royalties to said Harper, or his assigns, which royalties were accepted without question, until December, 1924, when said assignee sold and transferred the same to H. H. Owens, who in turn on the same day sold and transferred the same to appellee. Appellee testified that the consideration paid by him for such transfer was $15,000. Appellee claimed title to said lease and continued to operate the same as his predecessors had done, as heretofore set out.

■ The construction of an ambiguous contract, when parol evidence is adduced to aid such construction, ceases to be one purely of law and becomes a mixed question of law and fact to be determined by the court or jury trying the case. Alstin's Executor v. Cundiff, 52 Tex. 453, 461; Nalle v. McKnight (Tex. Civ. App.) 126 S. W. 902, 903; Arlington Heights Realty Co. v. Citizens' Railway & Light Co. (Tex. Civ. App.) 160 S. W. 1109, 1121, par. 20; Lamm & Co. v. Brannon (Tex. Civ. App.) 244 S. W. 256, 259, par. 5; Dallas Oil & Refining Co. v. Washington Cotton Oil Co. (Tex. Civ. App.) 283 S. W. 345, 346, par. 2. The determination of the issue involved is one of original jurisdiction to be exercised by the trial court. The cause will therefore be remanded for another trial.

Appellant complains of the judgment of the court dismissing, over his objection, his action against the Rose City Petroleum Company. Appellant's contentions may be more fully developed on another trial, and therefore the judgment herein is also reversed as to said appellee. Appellant makes no complaint of the judgment of the court dismissing all the other parties defendant to the suit, and such judgment is therefore affirmed.