**N. M. URANIUM, INC., and United States Steel Corporation, Appellants,**

v.

**Margaret Lyne MOSER et al., Appellees.**

**No. 1443.**

Court of Civil Appeals of Texas, Corpus Christi.

Sept. 21, 1979.

Charles G. King, Bracewell & Patterson, Houston, for appellants.

William G. Burnett, Burnett & Burnett, Sinton, for appellees.

## OPINION

BISSETT, Justice.

Involved in this appeal is the construction of certain royalty provisions in an amendment to a uranium mining lease. Suit was instituted by N. M. Uranium, Inc., and United States Steel Corporation, hereinafter called "appellants," against Margaret Lyne Moser, individually, and Margaret Lyne Moser and William Barnett Moser, Jr., as independent executors and testamentary trustees of the Estate of Catherine Carol Lyne, hereinafter called "appellees," wherein all parties sought a construction of the questioned royalty provisions in the lease, as amended on April 1, 1975. Prior to trial, the trial court, by a partial summary judgment, ruled that the royalty provisions in question were ambiguous as a matter of law insofar as they pertained to "in-kind" royalties. Trial was to a jury. Only one special issue was submitted to the jury, which inquired:

"Do you find from a preponderance of the evidence that the parties to the April 1, 1975, amendment mutually intended, by the in-kind provisions appearing as the last paragraph of the amendment, that the Mosers could elect to take, as their

royalty on uranium produced from the lease by solution mining, one-sixteenth (1/16th) of the uranium oxide ('yellow cake')?"

The jury answered: "Yes."

Judgment was rendered which decreed that the appellants deliver to the appellees, as royalty, one-sixteenth (1/16th) of the uranium oxide produced from the uranium ore mined from the leased premises and "stockpiled" as of June 30, 1978, and a similar fractional share, as royalty, processed from and after June 30, 1978. The judgment, which was signed on August 17, 1978, further decreed that the appellees recover from the appellants the sum of $333,780.60, together with both pre-judgment and post-judgment interest thereon. The appellants have appealed.

A mining lease was entered into on April 16, 1969, by and between the appellees, as lessor, and Atlantic-Richfield Company (Arco), as lessee, for the mining and production of uranium and other fissionable materials from certain lands owned by the lessors. The lease was amended on April 1, 1975, by an instrument denominated "Amendment of Mining Lease." It was signed by the appellees, as lessor, and by Arco and the appellants (who had acquired an interest in the 1969 lease), as lessee. Subsequently, and prior to the date of trial, the appellants acquired all of Arco's interest in the subject lease.

The dispute between the parties is in the construction of the royalty provisions in the lease, as amended, for uranium oxide produced from the land covered by the lease by the process known as "solution mining," a process by which wells are drilled into the uranium ore formation and liquids are then injected through those wells into the formation to dissolve the uranium ore. The solution is then extracted from the formation through other wells and is processed in a plant nearby, resulting in the product "uranium oxide."

There is only one real issue in dispute in this case. That issue is whether, as the appellants contend, the amount of uranium oxide the appellees can take as their royalty

in kind on the first 450,000 pounds of annual production for five years from January 1, 1975, is limited to the physical equivalent of the $1.50 per pound money royalty set out in paragraph B of the "ROYALTY" section of the 1975 amendment, or whether, as the appellees contend, the concluding paragraph of the amendment gives them the right to take as their royalty a physical 1/16th of all uranium oxide produced by solution mining during the said five year period.

The pertinent royalty provisions in the 1975 Amendment of Mining Lease read as follows, to-wit:

### "ROYALTY

Lessor, whose royalty interest shall never bear costs of production or marketing hereby reserves as royalty sums equal to the following:

\* \* \* \* \* \*

B  For uranium bearing ores extracted by solution mining the royalty shall be (1/16th) one-sixteenth of the sales revenue received for the uranium oxide ($U_3 O_8$) attributable to the production produced and sold from the Leased Premises . . However, for five (5) years from January 1, 1975, lessor's royalty for the first 450,000 pounds of uranium oxide produced and sold from the Leased Premises during a calendar year will not exceed $1.50 per pound. . . ."

\* \* \* \* \* \*

"The following shall apply to the royalties reserved in paragraphs A, B, C and D above:

\* \* \* \* \* \*

Any provision herein to the contrary notwithstanding, Lessor, at Lessor's expense, shall have the continuing right and option at any time and from time to time to take Lessor's royalty in kind. Lessor may exercise such option by giving sixty (60) days' advance written notice to Lessee."

By letter dated January 25, 1977, the appellees notified the appellants of their

election to take their royalty on uranium produced by solution mining "in kind." They further indicated to the appellants that they regarded this royalty as not being one-sixteenth of the sales revenue received for that uranium subject to a $1.50 per pound limitation for the first 450,000 pounds of uranium oxide produced per year from January 1, 1975, to January 1, 1980, but one-sixteenth of all stockpiled production as well as one-sixteenth of the future production as in-kind royalty.

There are two royalty provisions in the lease amendment here involved. The first is found in paragraph B of the "ROYALTY" section in the amendment, where the royalty reserved is 1/16th of the sales revenue from production, subject to the limitation that for the first 450,000 pounds of uranium production for any year of the first five years from January 1, 1975, appellees will be paid no more than $1.50 per pound. The second is found in the concluding paragraph of the amendment in question. It requires that the royalty so reserved be paid to appellees in kind upon their election in writing.

Both parties contend that the royalty provisions are unambiguous as a matter of law, and, therefore, it was error for the trial court to rule that an ambiguity existed. We agree.

The appellants say that when the second royalty provision is considered along with the first royalty provision, there is no conflict between the royalty provision set forth in paragraph B of the "ROYALTY" section (the first royalty provision), and the concluding paragraph of the section (the second royalty provision). They argue that the construction is simply that the appellees can take their royalty either in cash or in kind; and, if they elect to take their royalty in kind, as they did here, then their royalty is the physical equivalent of what would have been paid them in money. They argue that until January 1, 1980, the royalty to be paid appellees is $1.50 per pound on the first 450,000 pounds of uranium oxide produced per year, not a physical 1/16th of production.

The appellees assert that the first royalty provision in the lease, is, in effect, a fee simple realty interest in 1/16th of the uranium ore in place even though created by language making the royalty payable only in money. They further assert that the second royalty provision requires that their royalty be paid to them in kind when they so elect in writing, and that this provision, upon election, entitles them to 1/16th of the uranium production in kind without any limitation whatsoever and without regard to sales price.

The appellants attach little significance, if any, to the introductory words "Any provision herein to the contrary notwithstanding," which appear in the first sentence in the concluding paragraph of the royalty amendment. They argue that these words, along with the remainder of the in-kind royalty provision, can be harmonized with the language contained in paragraph B, and that the introductory words do not, as a matter of law, nullify or affect the definition of "royalty" contained in the first sentence of paragraph B or eliminate the $1.50 per pound limitation on the first 450,000 pounds production per year during the five years from and after January 1, 1975.

The appellees attach great significance to such introductory words. They argue that by using those words in the amendment it is conclusively shown that the minds of the parties met on the proposition that the second royalty provision, on its becoming applicable when appellees made an election to take their royalty in kind, should be given full effect and should not be restricted by contrary language, if any, which appears in the first royalty provision. Finally, they contend that the second royalty provision clearly expresses the intent that the lessors would be entitled, upon their election, to receive as royalty 1/16th of the production, and, therefore, no ambiguity exists; or, if they be wrong, in the alternative, the jury's answer to the issue submitted foreclosed the dispute and the trial court properly rendered judgment for them on the jury's verdict.

■ In Texas, whether the language of a contract is ambiguous is a question of law for the court. *City of Pinehurst v. Spooner Addition Water Co.*, 432 S.W.2d 515, 518 (Tex.Sup.1968); *Nixon v. First State Bank of Corpus Christi*, 540 S.W.2d 817, 820 (Tex. Civ.App.—Corpus Christi), writ ref'd n. r. e., 544 S.W.2d 378 (Tex.Sup.1976). If the contract in issue is unambiguous, its interpretation is part of the court's obligation to interpret and apply the law. *Myers v. Gulf Coast Minerals Management Corp.*, 361 S.W.2d 193 (Tex.Sup.1962).

■ In construing an agreement the cardinal rule of construction is to ascertain the intention of the parties as expressed in the instrument. *Nixon v. First State Bank of Corpus Christi*, supra, at page 820 and authorities cited therein. The agreement must therefore be construed in its entirety and each part of that agreement must be considered with every other part to determine the effect of one part on another part. *Southland Royalty Company v. Pan American Petroleum Corp.*, 378 S.W.2d 50 (Tex. Sup.1964); *Steeger v. Beard Drilling, Inc.*, 371 S.W.2d 684 (Tex.Sup.1963).

■ A written instrument is not ambiguous if it is so worded that a court may give it a certain legal meaning or interpretation. *Universal C. I. T. Credit Corp. v. Daniel*, 150 Tex. 513, 243 S.W.2d 154 (1951); *Remington Rand Inc. v. Sugarland Industries*, 137 Tex. 409, 153 S.W.2d 477 (1941); *Lewis v. East Texas Finance Co.*, 136 Tex. 149, 146 S.W.2d 977 (1941). The Supreme Court stated in *Daniel*, 243 S.W.2d at page 157, that an agreement is ambiguous only:

". . . when the application of pertinent rules of interpretation to the face of the instrument leaves it genuinely uncertain which one of two or more meanings is the proper meaning . . . [citations omitted]. In other words, if after applying established rules of interpretation to the contract it remains reasonably susceptible to more than one meaning it is ambiguous, but if only one reasonable meaning clearly emerges it is not ambiguous."

In *Woods v. Sims*, 154 Tex. 59, 273 S.W.2d 617, 620–21 (1954), a case involving the construction of three mineral deeds, the Supreme Court said:

"Generally the parties to an instrument intend every clause to have some effect and in some measure to evidence their agreement, and this purpose should not be thwarted except in the plainest case of necessary repugnance. Even where different parts of the instrument appear to be contradictory and inconsistent with each other, the court will, if possible, harmonize the parts and construe the instrument in such way that all parts may stand and will not strike down any portion unless there is an irreconcilable conflict wherein one part of the instrument destroys in effect another part . . . [citations omitted]."

■ Minerals in place are part of the land, and when they are removed from the land, the corpus of the estate in the land is to that extent depleted. Consequently, anything, in whatever form, which the lessor receives from the production by the lessee of minerals from his land constitutes a remuneration for the removal of part of his land. *Sheppard v. Stanolind Oil & Gas Co.*, 125 S.W.2d 643 (Tex.Civ.App.—Austin 1939, writ ref'd).

■ It is well settled in this State that a mineral royalty, reserved or granted, and however payable, whether in a fractional interest in the minerals produced from the affected land or in money measured by the value of the product, is an interest in land covered by the contract. *Veal v. Thomason*, 138 Tex. 341, 159 S.W.2d 472 (1942).

■ The expression "anything in this lease to the contrary notwithstanding," when used in the final section of a written contract, has priority over any contrary provision of the contract directed to the same question. *Gulf Oil Corporation v. Southland Royalty Company*, 496 S.W.2d 547 (Tex.Sup.1973).

■ Applying the rules laid down in the above cases to the instant case, we hold that the lease, as amended, is not ambiguous.

The introductory words "Any provision herein to the contrary notwithstanding," which appear in the concluding paragraph in the royalty section of the amendment, is directed to the royalty reserved in paragraph B and the limitation contained therein. The second royalty provision, which conclusively entitled the appellees, upon their election in writing, to receive, in kind, 1/16th of the uranium oxide produced from the leased premises, is not in conflict with the first royalty provision which reserves unto appellees 1/16th of the sales revenue received from the production of uranium oxide from the lands under lease. The second royalty provision when standing alone, is, however, in conflict with that part of paragraph B of the first royalty provision, which provides for a 1/16th "of the sales revenue received for the uranium oxide," when the written election is exercised. But when the second royalty provision is preceded, as here, by the words "Any provision herein to the contrary notwithstanding," this provision has priority over the conflicting provision contained in Paragraph B. Therefore, we hold that the royalty amendment creates, as a matter of law, in the appellees a royalty fee in and to 1/16th of all the uranium oxide produced by solution mining from the lands covered by the lease during the existence of the lease.

■ While the trial court erred in holding that the royalty provisions in the amendment were ambiguous, such error is not a ground for reversal since a correct judgment was rendered. *Harvey v. Elder,* 191 S.W.2d 686 (Tex.Civ.App.—San Antonio 1945, writ ref'd); *Messer v. County of Refugio,* 435 S.W.2d 220, 227 (Tex.Civ.App.—Corpus Christi 1968, writ ref'd n. r. e.).

Having determined that the trial court rendered a correct judgment, and even though it is not necessary that we dispose of appellants' remaining points of error, we will consider and dispose of them.

■ Appellants further complain that the trial court erred in admitting extrinsic evidence to determine the intention of the parties to the 1975 amendment; that the trial court erred in rendering judgment

for the appellees because: 1) there is "no evidence" that the parties to the 1975 amendment mutually intended that the appellees could take a physical 1/16th of uranium production during the five year period commencing January 1, 1975, as their royalty in kind; and 2) the jury's verdict is contrary to the great weight and preponderance of the evidence as to the intention of Arco that the royalty on uranium produced by solution mining would be the same whether paid in cash or in kind. In disposing of those complaints, we follow the guidelines laid down in Calvert, "No Evidence" and "Insufficient Evidence," 38 Tex. L.Rev. 359 (1960).

The primary term of the original lease was for six years and would have terminated on April 15, 1975, absent production or an extension of its primary term. Sometime in late 1973, or early 1974, an Arco representative contacted the appellees with regard to amending the lease. Serious discussions were commenced in August, 1974. Arco was represented by Mr. Glen Davis and Mr. Bill Morton, attorneys, and the appellees were represented by Mr. Paul Smith and Ted Lee, attorneys. Arco was primarily concerned with securing an amendment which would extend the time beyond April 15, 1975 for the commencement of solution mining operations on the leased premises. The appellees were primarily concerned with royalty provisions which would protect them against an increase in price of uranium oxide to their detriment and against improvident sales contracts (executed by Arco) to their detriment.

The appellees first insisted that the amendment contain a "favored nations" provision, that is, a clause which would provide that if anyone within the State of Texas was able to sell uranium oxide at a higher price than that sold by the lessee (Arco) under the 1969 lease, then the lessors would be paid the same price for their royalty share of the uranium produced by Arco from the leased lands as paid to others. Arco rejected the inclusion of such a provision in the proposed amendment, but

did agree that the lease should be amended to clearly show what the royalty fractional interest should be. It was then agreed that such interest would be 1/16th for uranium oxide produced by solution mining.

Thereafter, the negotiators for Arco and the appellees met on several occasions. Several amendments were proposed and rejected. A meeting of Arco's management committee, which was held on December 9, 1974, decided to offer the appellees three royalty alternatives, and that in the event of refusal of any of them, "an attempt would be made to reach agreement on a straight royalty up to a one-sixteenth." Apparently these royalty alternatives were rejected by the appellees. At a meeting on March 14, 1975, the negotiators discussed an in-kind royalty provision. With respect thereto, Mr. Davis testified:

> "A  Well, I recall Paul Smith saying that he felt that his client needed protection against the possibility that Atlantic Richfield, or the operating group, would sell their uranium to a sister company at a fictitiously low price and calculate the royalty at that artificially low price.
>
> He said, 'What protection could Mr. Moser have against that possibility?' And my response to that, as I recall, was that we could provide for him to take his royalty in kind."

After the March 14 meeting, Arco prepared another draft of the amendment. It did not, however, include either a favored nations clause or an in-kind provision with respect to royalty. Mr. Smith then telephoned Mr. Morton and dictated an "in kind royalty provision" which he stated must be included in the lease. Mr. Morton then talked to Mr. Davis concerning Mr. Smith's demand. At the trial, Mr. Morton stated:

> "I called Glen Davis and I talked with him about it. And my recollection is that he said he didn't see—we both felt that the liklihood of Mr. Moser taking the royalty in kind was pretty low. But, if it ever happened, we could work out something.

So, we felt that the stage that things were at in April there, that it was okay. It was no use haggling over something like that, so we would go ahead and take it—that provision."

Whereupon, Mr. Morton telephoned Mr. Smith and told him that the dictated "in kind royalty provision" was "all right." That provision appears as the concluding paragraph in the royalty section of the amendment (the second royalty provision), hereinbefore quoted. The amendment, when finally executed by all parties, extended the term of the 1969 lease. As a consequence, the lease was valid when production of uranium oxide by solution mining was established sometime after April 15, 1975.

There is no question but that the jury finding with respect to the appellees is supported by direct evidence of probative value. While there is no direct evidence that Arco intended the "in kind royalty provision" in the lease to have the same meaning attributed to it by the jury, the record does show that during the time of serious negotiations the royalty under consideration was referred to as a fractional 1/16th royalty. Mr. Davis suggested a 1/16th in-kind royalty in lieu of a favored nations clause which he, in effect, said would afford the appellees their desired protection. Mr. Morton was of the impression that the royalty amendment, in substance, did provide for a 1/16th royalty in kind; and the appellants rendered 15/16ths of the uranium for ad valorem taxation to the proper taxing authorities. Those facts, together with permissible inferences and deductions, constitute a sufficient legal basis which supports the jury's answer to the issue submitted. There is ample evidence to support the jury's finding, and the answer to the single issue submitted to the jury is not against the great weight and preponderance of the evidence so as to be manifestly wrong and unjust. It was not reversible error to introduce extrinsic evidence to determine the intention of the parties by the inclusion of the last paragraph in the royalty section of the amendment to the 1969 mining lease.

■ The trial court's charge to the jury included the following instruction:

"In connection with the foregoing special issue you are instructed that you may take into consideration the facts and circumstances surrounding the making of the April 1, 1975, lease amendment, as well as any acts done mutually by the parties in the performance of the amendment; and that a party to a contract will be held to have intended that the words used in that contract have a meaning, if any, which he knew, or should have known, the other party to that contract supposed the words to mean."

Appellants complain of that instruction. They argue that it was reversible error to so instruct the jury because subjective undisclosed thoughts and beliefs of the parties are not to be considered in ascertaining the intentions of the parties to a contract.

The appellees rely upon *San Jacinto Oil Company v. Ft. Worth Light & Power Company*, 41 Tex.Civ.App. 293, 93 S.W. 173, 176 (1906, writ ref'd), wherein it was said:

"[a]nd a party will be held to that meaning which he knew the other party to the contract supposed the words to bear . . ."

The appellants contend that the rule announced in *San Jacinto* was rejected in *Jackson v. Richards*, 157 S.W.2d 982 (Tex. Civ.App.—El Paso 1941, writ ref'd). We do not agree. The Court, in *Jackson*, cited *San Jacinto* and other cases for the proposition: "a party will be bound by that meaning which he knew the other party to the contract supposed the words to bear. The Court, in *Jackson*, at page 984, said:

"We have read the cases cited. The rule, we think, was properly applied under the facts in those cases . . ."

*Jackson* did not reject or overrule the rule announced in *San Jacinto*, even though it did recognize that the rule was "of limited application." The facts in this case make the rule applicable. Here, it is clearly shown by sufficient evidence of probative value that Arco's lawyers and negotiators, at the times in question, knew that appellees' lawyers and negotiators intended the "in-kind royalty provision" in the amendment to have the same meaning attributed to it by the jury. The instruction was proper if the trial court was correct in holding that the in-kind provision is ambiguous. On the other hand, if the royalty provisions were not ambiguous, as we have held, the case should not have been submitted to the jury; therefore, the giving of the instruction was harmless error.

■ Moreover, even if the instruction complained of by the appellants is an incorrect statement of the law, as asserted by them, then the consideration of its probable effect on the minds of the jury in the light of the charge as a whole can lead only to the conclusion that the charge, when viewed in its entirety, was favorable to the appellants. This is true because the charge concluded with the instruction:

"You are also instructed that, under the law, any doubt as to the meaning of the 'in kind' paragraph concluding Exhibit A to the 1975 Amendment is to be resolved most strongly against the Mosers and in favor of N M Uranium, Inc. and United States Steel Corporation."

See *Texas Employers Ins. Ass'n. v. McKay*, 146 Tex. 569, 210 S.W.2d 147 (1948); *Crittenden v. Dominguez*, 315 S.W.2d 45 (Tex. Civ.App.—Dallas 1958, no writ). The appellants have failed to demonstrate that any harm resulted from the instruction under attack.

■ The appellants further contend that the admission into evidence of their tax renditions for the years 1977 and 1978 constituted reversible error as they "had nothing to do with the issue of the intention of the parties to the 1975 Amendment of Mining Lease." They argue that such evidence was highly prejudicial. We disagree. The renditions show that the interest in the uranium claimed by the appellants as their property amounted to $15/16$ths of all the uranium in, on and under the lands covered by the mining lease. By so rendering their property, the amount of interest in the uranium remaining is $1/16$th. Together, the appellants and the appellees owned *all* of the uranium ore underlying the leased premis-

es. An inference properly drawn from the tax renditions in question is that the appellants intended to render for taxation only the property that they owned, which, in this case is a $^{15}/_{16}$ths interest. A further inference is that they did not claim to be the owner of the remaining $^{1}/_{16}$th interest. It was not reversible error to introduce the tax rendition into evidence.

We have carefully considered all of appellants' points of error. They are all overruled.

AFFIRMED.