Reversed and Remanded and Opinion filed August 25, 2009








Reversed
and Remanded and Opinion filed August 25, 2009.

 

 

In The

 

Fourteenth Court of
Appeals

_______________

 

NO. 14-07-01015-CV

_______________

 

CHESTER MONTGOMERY, Appellant

 

V.

 

RICHARD BYRD, Appellee

                                                                                                                                               


On Appeal from the County Civil Court
at Law No. 4

Harris County, Texas

Trial Court Cause No. 833884

                                                                                                                                               


 

M E M O R A N D U M  O P I N I O N








Appellant,
Chester Montgomery, sued appellee, Richard Byrd, for breach of contract, and
Byrd asserted a counterclaim for breach of contract.  Pursuant to the jury=s findings, the trial court signed a
judgment in favor of Byrd.  The trial court subsequently signed an AOrder Granting Plaintiff=s Motion to Reconsider Defendant=s Motion to Enter Judgment and
Plaintiff=s Motion for Judgment NOV and Plaintiff=s Motion to Establish the Amount of
Supersedeas Bond and Order for Deposit in Lieu of Bond,@ modifying the amount of damages
awarded in the previously-signed judgment.  In a single issue encompassing
several alternative arguments, Montgomery contends the trial court erred by
denying his motion for directed verdict or the evidence is legally and
factually insufficient to support the jury=s verdict.  We conclude the trial
court erred by denying Montgomery=s motion for directed verdict. 
Accordingly, we reverse the trial court=s judgment, as modified by the
subsequent order, and remand with instructions that the trial court render
judgment in favor of Montgomery for $24,103.95, plus reasonable attorney=s fees and pre-judgment and
post-judgment interest.[1]

I.  Background

Montgomery
owns several machine shops, and Byrd is a machinist.  They have known each
other for many years.  In 1989, Montgomery started a new shop called AUSA Precision Machining Company@ (Athe company@).  He hired Byrd to operate the
company so that Montgomery could devote his attention to another shop.  Byrd
held no ownership interest but received a third of the company=s net profits as compensation.  Byrd
held this position for ten years.  He was responsible for the operation of the
company, including hiring employees, negotiating the terms of their employment,
and overseeing payment of their salaries.

In 1999,
the parties= relationship soured because Byrd believed he had not been fully
compensated as agreed.  On September 10, 1999, the parties signed a AFull and Final Settlement and Release
Agreement and Confidentiality Agreement@ (Athe agreement@) to resolve the dispute and dissolve
their relationship.  Under the agreement, Montgomery promised to pay Byrd
$330,000 through an initial payment of $70,000 followed by 260 weekly
installments of $1,000.  Montgomery contemporaneously executed a promissory
note and security agreement.  








Montgomery
made all required payments until May 2003, when he ceased doing so although
$60,000 remained due.  At that point, Montgomery contended he did not owe Byrd
any more money for the reason described below.

Article
III of the agreement, entitled AContractual Recitals and Statement of Purpose,@ includes a Section D, entitled AMutual Release.@  The first three paragraphs of
Section D contain broad language in which the parties essentially release each
other from claims arising out of their dispute.  Paragraph 4 of Section D
(hereinafter AParagraph D4@) then provides as follows: 

Anything herein to the contrary
notwithstanding, each party to this Agreement shall be responsible and liable
for his pro rata share (i.e., Montgomery, 2/3 and Byrd, 1/3) of any and all costs,
expenses (including attorneys= fees) or damages resulting from the claims, actions, or
causes of action or damages of whatsoever kind or nature of third parties, not
specifically released hereunder, arising out of the conduct of the business
known as USA Precision Machining Co. at any time prior to the date hereof,
whenever such claim is made. 

When the
parties executed the agreement, a former employee, William Marshall, had
already sued the company, claiming he was not properly compensated during his
employment.  Although Byrd had been responsible for hiring and paying Marshall,
Montgomery was effectively the only person sued because he was sole owner of
the company.  A jury eventually awarded Marshall damages, plus interest and
attorney=s fees.  The Marshall suit was
concluded in May 2003 following Montgomery=s unsuccessful appeal to the Texas
Supreme Court.  Montgomery paid a total of $212,375.34 with respect to the Marshall
suit, including his own attorney=s fees to defend the case.  Relying
on Paragraph D4, Montgomery concluded Byrd was responsible for 1/3 of this
amount, which 1/3 portion exceeded the $60,000 still due to Byrd under the
agreement.  As Montgomery explained at trial, at that point, Byrd owed him more
money than he owed Byrd.  








In
addition, after the agreement was executed, Albert Hansen and three others, all
former employees of the company who also claimed they had not been properly
compensated, filed suit against Montgomery and the company.  Montgomery
successfully defended the Hansen suit, which was concluded in mid-2004,
but he incurred $39,936.50 in attorney=s fees.  At that point, Montgomery
calculated that Byrd owed him $24,103.95, which equaled $84,103.95 (1/3 of the
total payments of $252,311.84 on the Marshall and Hansen suits)
minus the $60,000 balance due Byrd under the agreement. Byrd has refused to
reimburse Montgomery for 1/3 of the Marshall and Hansen payments.


Montgomery
sued Byrd for breach of the agreement, seeking the $24,103.95, plus attorney=s fees and interest.[2] 
Byrd counterclaimed, also alleging breach of the agreement  and seeking the
$60,000 balance due thereunder, plus attorney=s fees and interest.

Trial
was to a jury.  After the parties rested, Montgomery orally moved for a
directed verdict, supported by a written brief, but the court denied the
motion.  Over Montgomery=s objection, the trial court submitted jury questions
regarding both parties= alleged breach.  The jury found that Byrd did not breach the
agreement.  Therefore, pursuant to instructions in the charge, the jury did not
answer questions regarding whether Byrd=s breach was excused, Montgomery=s damages resulting from Byrd=s breach, and Montgomery=s attorney=s fees.  The jury also found that
Montgomery breached the agreement, his failure to comply was not excused, Byrd
incurred damages of $80,000, and Byrd=s reasonable attorney=s fees were $15,000.  Montgomery
filed a motion for judgment notwithstanding the verdict and motion to disregard
the jury=s answers, which the trial court
denied.








On
October 25, 2007, the trial court signed a judgment, ruling that Montgomery
take nothing and awarding Byrd $80,000 in damages, $15,000 for attorney=s fees, and, pursuant to the parties= stipulation, conditional attorney=s fees of $5,000 and $2,500 in the
event of appeals to the Court of Appeals and Texas Supreme Court, respectively,
and pre-judgment and post-judgment interest.  Montgomery subsequently filed a
motion for new trial.  The record indicates the trial court denied the motion
on  December 18, 2007, although the order is not included in the record. 
However, on that same day, the trial court did sign an AOrder Granting Plaintiff=s Motion to Reconsider Defendant=s Motion to Enter Judgment and
Plaintiff=s Motion for Judgment NOV and Plaintiff=s Motion to Establish the Amount of
Supersedeas Bond and Order for Deposit in Lieu of Bond,@ modifying the judgment to award
damages of $60,000, instead of $80,000, in accordance with the evidence
presented at trial.  Montgomery appeals from the October 25, 2007 judgment, as
modified by the December 18, 2007 order.

II.  Issues and Standard of Review

Montgomery
presents one stated issue which encompasses several alternative sub-issues. 
His overarching contention is that he proved as a matter of law the agreement
requires Byrd to reimburse Montgomery for 1/3 of the Marshall and Hansen
payments.  As Montgomery asserts, Byrd did not dispute the evidence showing 1/3
of the Marshall and Hansen payments equaled $84,103.95 or that
Byrd refused to pay this amount.  Moreover, Montgomery did not dispute that he
owes Byrd $60,000 under the agreement.  Montgomery argues that, therefore, the
trial court erred by denying his motion for directed verdict and submitting any
jury issues because the $60,000 he owes to Byrd must be offset by $84,103.95,
thereby mandating judgment for $24,103.95, plus attorney=s fees, in Montgomery=s favor.

In
response, Byrd challenges Montgomery=s interpretation of the agreement,
arguing it imposes no obligation on Byrd to bear a portion of the Marshall
and Hansen payments.  Alternatively, Byrd suggests we should affirm the
judgment based on his affirmative defenses of waiver and failure to mitigate
even if we interpret the agreement in favor of Montgomery. 








An
appeal from the denial of a motion for directed verdict is in essence a
challenge to the legal sufficiency of the evidence.  Solares v. Solares,
232 S.W.3d 873, 878 (Tex. App.CDallas 2007, no pet.).  An appellant presenting a
legal-sufficiency challenge on an issue on which he bore the burden of proof
must demonstrate the evidence conclusively established all vital facts to
support the issue.  Id. at 878B79.  In particular, a directed
verdict is proper for a plaintiff if the evidence conclusively proves facts
that establish his right to recovery.  Lemaster v. Top Level Printing Ink,
Inc., 136 S.W.3d 745, 747 (Tex. App.CDallas 2004, no pet.); see Sherman
v. Elkowitz, 130 S.W.3d 316, 319 (Tex. App.CHouston [14th Dist.] 2004, no pet.)
(recognizing that directed verdict is proper if, among other circumstances, the
evidence conclusively proves a fact that establishes a party=s right to judgment as a matter of
law).  Evidence is conclusive Aonly if reasonable people could not differ in their
conclusions, a matter that depends on the facts of each case.@  City of Keller v. Wilson,
168 S.W.3d 802, 816 (Tex. 2005).  We will credit the favorable evidence if
reasonable jurors could and disregard the contrary evidence unless reasonable
jurors could not.  Id. at 827.  

As
explained below, we conclude the trial court erred by denying Montgomery=s motion for directed verdict because
he conclusively proved facts establishing his right to recovery.[3]








III.  Interpretation of Paragraph D4

In
construing a contract, our primary goal is to ascertain and give effect to the
parties= intent as expressed in the contract. 
Seagull Energy E & P, Inc. v. Eland Energy, Inc., 207 S.W.3d 342, 345
(Tex. 2006).   Contract terms are given their plain, ordinary, and generally
accepted meanings unless the contract itself shows them to be used in a
technical or different sense.  Valence Operating Co. v. Dorsett, 164
S.W.3d 656, 662 (Tex. 2005).  The more specific provisions of a contract will
control over the general.  Forbau v. Aetna Life Ins. Co., 876 S.W.2d
132, 133B34 (Tex. 1994).  Unless the contract
is ambiguous, a court will construe it as a matter of law. Am. Mfrs. Mut.
Ins. Co. v. Schaefer, 124 S.W.3d 154, 157 (Tex. 2003); Coker v. Coker,
650 S.W.2d 391, 393 (Tex. 1983). 

At first
glance, Paragraph D4 seems to unambiguously require Byrd to reimburse
Montgomery for 1/3 of the Marshall and Hansen payments because
the evidence established, and Byrd did not dispute, that the Marshall
and Hansen claims arose out of the conduct of USA Precision Machining
Co. which occurred before the agreement was executed.  Further, it is
immaterial some of the claims were asserted after the agreement was executed
because Paragraph D4 includes claims made after that date as long as the
conduct occurred before that date.  Moreover, the Marshall and Hansen
claims were not specifically released under any other part of the agreement. 
Finally, it is insignificant the claimants sued only Montgomery/the company
because Paragraph D4 does not limit Byrd=s obligation only to causes of action
in which he was named as a party.

Nonetheless,
Byrd contends the parties= intent must be determined from the whole agreement, rather
than an isolated provision.  He argues Paragraph D4 does not encompass claims
brought by former employees, such as the Marshall and Hansen
claimants, and the whole agreement demonstrates Montgomery and Byrd intended to
release each other relative to such claims. 








A.        Inclusion of
the Marshall and Hansen Claims In Paragraph D4

In
support of his position that Paragraph D4 does not encompass claims of former
employees, Byrd cites several terms at the outset of the agreement.  In
particular, Article I is entitled ADEFINITIONS,@ and Article II is entitled, APARTIES.@

Article
II lists the APARTIES @ as:

1.         Richard Byrd 

2.         Richard Byrd Entities and/or

3.         Richard Byrd Derivative Claimants 

4.         Chester Montgomery

5.         Chester Montgomery Entities and/or 

6.         Chester Montgomery
Derivative Claimants.

Article
I contains various definitions including the following:

AChester
Montgomery@ shall mean those persons and/or entities (whether now
in existence or not), and which are or were formerly owned or
controlled, in whole or in part, directly or indirectly, by Chester
Montgomery, (as defined herein); and their respective entities, employers, employees,
directors, shareholders, officers, assigns, predecessors, successors,
attorneys, representatives or agent of such person and/or entities.

AChester
Montgomery Derivative Claimants@ shall mean any
person or entity acting by, through, or under Chester Montgomery (including by
reason of marriage or family relationships, any such person), or any of the
Chester Montgomery Entities hereinabove defined.

ARepresentatives@ of a person or entity shall mean and
include all of that person=s or entity=s past or present principals, agents, servants, employees,
attorneys, consultants, experts, partners (both general and/or limited), equity
participants, officers, directors, shareholders, parent companies,
subsidiaries, affiliates, predecessors, successors, assigns, estates,
beneficiaries, heirs, devisees, legatees, trustees, and personal
representatives.

(emphasis added). 
Article I also includes substantively identical definitions for ARichard Byrd@ and ARichard Byrd Derivative Claimants.@








According
to Byrd, under these terms, AChester Montgomery@ as a party to the agreement includes
former employees of the company; therefore, former employees cannot be
considered Athird parties@ under Paragraph D4, which requires Byrd to pay 1/3 of claims
asserted by Athird parties.@

We
recognize that, under rules of contract construction, to discern the parties= intent, we ordinarily examine the
entire contract in an effort to harmonize and give effect to all provisions so
that none will be rendered meaningless.  Seagull Energy, 207 S.W.3d at
345;  Schaefer, 124 S.W.3d at 157.  Further, generally no single
provision taken alone will be given controlling effect; rather, all provisions
must be considered with reference to the whole instrument.  Seagull Energy,
207 S.W.3d at 345.

However,
as Montgomery emphasizes, Paragraph D4 begins with the language, A[a]nything herein to the contrary
notwithstanding.@  Construing
similar language, our court has recognized that, when parties use the clause Anotwithstanding anything to the
contrary contained herein@ in a paragraph of their contract, they contemplate the
possibility other parts of the contract may conflict with this paragraph and
agree this paragraph must be given effect regardless of any contrary
provisions.  Helmerich & Payne Int=l Drilling Co. v. Swift Energy Co., 180 S.W.3d 635, 643 (Tex. App.CHouston [14th Dist.] 2005, no pet.); see
N.M. Uranium, Inc. v. Moser, 587 S.W.2d 809, 814B15 (Tex. Civ. App.CCorpus Christi 1979, writ ref=d n.r.e.) (stating that lease
provision containing introductory clause AAny provision herein to the contrary
notwithstanding@ had priority over conflicting provision).

Montgomery
argues that, under their common meanings, AMontgomery@ and AByrd@ as used in Paragraph D4 entail the
individuals only, i.e., the two persons who signed the agreement; therefore,
any other provisions defining Chester Montgomery and Richard Byrd more broadly
conflict with Paragraph D4 and must be disregarded.  We agree.








We first
note Byrd did not raise at trial the contention he emphasizes on appeal.  In
fact, in response to questioning by Montgomery=s attorney, Byrd seemed to admit that
third parties as used in Paragraph D4 describes the Marshall and Hansen
claimants.[4]  Regardless,
the scope of Paragraph D4 is a question of law for the court as an issue of
contract interpretation.  

Further,
at trial, Byrd apparently maintained that, despite inclusion of Paragraph D4,
he was released from any claims whatsoever arising out of his and Montgomery=s relationship.  At one point on
appeal, Byrd seems to re-urge this position despite primarily suggesting that
Paragraph D4 imposes some obligation on Byrd relative to claims of
third-parties but former employees are not encompassed therein.  Clearly,
Montgomery and Byrd intended for Byrd to assume an obligation for payment of
some claims or they would not have included Paragraph D4 and provided it was
effective despite any conflicting provisions.  Accordingly, we will determine
whether Paragraph D4 encompasses claims of former employees. 








On one
hand, the definitions at the outset of the agreement are indeed quite broad and
indicate that APARTIES@ includes Montgomery=s former employees.  Specifically, the definition of AChester Montgomery@ includes entities he owned and
employees or representatives of those entities.  Although Aemployees@ of those entities connotes current
employees at the time the agreement was executed, Arepresentatives@ seems to include past and present
employees.[5]  Moreover, we
should presume these broad definitions were included in the agreement for some
purpose.  See Seagull Energy, 207 S.W.3d at 345.

On the
other hand, the numerous persons and entities included within these broad
definitions clearly cannot be parties to the agreement for all purposes because
they did not sign it and are not bound thereby.  Specifically, these broad
definitions cannot possibly be applied to Paragraph D4.

Unlike
many portions of the agreement which set forth release language, Paragraph D4
imposes an affirmative obligation on the partiesCAMontgomery@ and AByrd@Cto pay a portion of third-party
claims.  Under Byrd=s reasoning, any of the numerous persons or entities included
in the broad definitions of Montgomery and Byrd would be bound by this
affirmative obligation because they are parties to the agreement.  Obviously,
these persons cannot be bound by such an obligation in an agreement they did
not sign. For example, the broad definitions include past or present Aexperts.@  Montgomery and Byrd cannot have
intended that their experts are required under Paragraph D4 to pay certain
claims when they did not sign the agreement. 








Therefore,
applying the broad definitions of the parties outlined at the outset of the
agreement to Paragraph D4 would lead to an absurd result.  See Ill. Tool
Works, Inc. v. Harris, 194 S.W.3d 529, 533 (Tex. App.CHouston [14th Dist.] 2006, no pet.)
(stating a court will not construe contract to produce absurd result).[6] 
Instead, the parties for purposes of Paragraph D4 can only mean Montgomery and
Byrd individually.  Consequently, the provisions defining Montgomery and Byrd
more broadly conflict with Paragraph D4 and cannot be applied to that
paragraph.  Therefore, the Marshall and Hansen claimants are
third parties for purposes of Paragraph D4.

B.        Other Release Provisions

Byrd
further cites several other provisions in Article III of the agreement that
allegedly release him from any responsibility relative to claims of former
employees.  Specifically, he relies on Paragraphs A4 and B2, which provide
respectively, in pertinent part:

Chester Montgomery, Chester
Montgomery Entities and/or Chester Montgomery Derivative Claimants jointly and
severally warrant and represent that there are no persons and/or entities other
than the persons and entities listed herein which now, or formerly were, owned
or controlled (in whole or in part, either directly or indirectly) by any of
them which have, have had, or could have any actual or potential claim, demand,
suit, cause of action, charge, or grievance, of any kind or character against
Richard Byrd, or any of them, and/or any of the Richard Byrd Entities and/or
Richard Byrd Derivative Claimants.

Chester Montgomery, Chester
Montgomery Entities and/or Chester Montgomery Derivative Claimants jointly and
severally warrant and represent that there is no actual or potential claim,
demand, suit, cause of action, charge or grievance, which is not subject to and
fully released by the Settlement Agreement, except for matters as may be
expressly excluded in the Settlement Agreement, held by any person or entity
against Richard Byrd, and/or any of the respective Richard Byrd Entities and/or
Richard Byrd Derivative Claimants, whether unfounded or not, that concerns or
relates in any way, directly or indirectly, to the Dispute.

Byrd argues that, reading
the above-quoted paragraphs together, Montgomery warranted there are no actual
or potential claims that are not fully released under the agreement.








Byrd
also relies on Paragraph D3, which immediately precedes Paragraph D4 and
provides:

Chester Montgomery, the Chester Montgomery Entities and/or Chester
Montgomery Derivative Claimants, jointly and severally, do hereby fully and
finally RELEASE, ACQUIT, AND FOREVER DISCHARGE Richard Byrd and the
respective Richard Byrd Entities and/or Richard Byrd Derivative Claimants (and
their representatives, as the same are hereinabove defined), and Chester
Montgomery and Chester Montgomery Entities and/or Chester Montgomery Derivative
Claimants, further, jointly and severally, covenant not to assert in any manner
against any of such persons or entities released hereby, any and all actual or
potential claims held by Chester Montgomery, Chester Montgomery Entities and/or
Chester Montgomery Derivative Claimants against Richard Byrd, and/or Richard
Byrd Entities and Richard Byrd Derivative Claimants and/or any suits, demands,
causes of action, charges or grievances of any kind or character whatsoever, heretofore
or hereafter accruing for or because of any matter done, omitted or suffered to
be done by any such party hereto prior to and including the date hereof, and in
any manner (whether directly or indirectly) arising from or related to the
Dispute. 

(emphasis in original). 
Byrd argues that, under this provision, Montgomery directly releases Byrd from
claims of former employees.








We do
not necessarily agree that Paragraphs A4, B2, and D3 entail a release of Byrd
with respect to claims of former employees.  Regardless, even if these
provisions do entail such a release, they conflict with Paragraph D4.  In light
of the introductory language in Paragraph D4, it is effective despite any other
conflicting release provisions.[7]  Accordingly,
Montgomery proved as a matter of law that Paragraph D4 requires Byrd to
reimburse Montgomery for 1/3 of the Marshall and Hansen payments.

IV.  Byrd=s Affirmative
Defenses

Byrd
suggests we should affirm the judgment based on his affirmative defenses of
waiver and failure to mitigate even if we interpret the agreement in favor of
Montgomery.

A.        Waiver

Byrd
pleaded waiver and requested a jury question on this defense, which the trial
court refused to submit.  A judgment Acannot be permitted to stand@ when the trial court denies proper
submission of a viable affirmative defense properly requested as part of the
charge and timely raised by the pleadings and evidence.   Exxon Corp. v.
Perez, 842 S.W.2d 629, 631 (Tex. 1992); see 4901 Main, Inc. v.
TAS Auto., Inc., 187 S.W.3d 627, 632 (Tex. App.CHouston [14th Dist.] 2006, no pet.). 
However, Byrd does not expressly raise by cross-point, or otherwise challenge
on appeal, the trial court=s refusal to submit a question on waiver.  He does not
request that we remand for a trial on waiver if we interpret the agreement in
Montgomery=s favor.  Rather, Byrd suggests that we nonetheless affirm the judgment
because waiver was conclusively established.  Nevertheless, we conclude that
Byrd did not present evidence of waiver justifying submission of a jury
question, much less conclusively establish this defense.  








Waiver
is the intentional relinquishment of a known right or intentional conduct
inconsistent with claiming that right.  4901 Main, Inc., 187 S.W.3d at
632.  Byrd argues that Montgomery waived any right to reimbursement for Byrd=s portion of the Marshall and Hansen
payments because Montgomery made the weekly installments owed to Byrd under the
agreement for over four years before offsetting any of Montgomery=s Marshall and Hansen
payments.

However,
Montgomery testified he did not seek reimbursement from Byrd during this period
because A[a]s long as I owe him more money
than he owes me, I=m not going to bill him for what he owes me.@  He explained that he quit paying
Byrd once the Marshall suit was concluded and he finally tallied all
payments on that suit and determined Byrd owed him more than he owed Byrd. 
Montgomery indicated in his testimony that, during the four-year period, he
intended to eventually seek reimbursement from Byrd for 1/3 of the Marshall
and Hansen payments.  Consequently, in light of Montgomery=s subjective explanation, the
four-year delay was not evidence he intentionally relinquished his right to
reimbursement or intentionally engaged in conduct inconsistent with claiming
that right. See id.  

In fact,
at trial, Byrd agreed that, at some time during the four-year period,
Montgomery Atold me he was carrying a lot of expenses and he wanted me to help him
with them, but I didn=t agree to help with them.@  Byrd also admitted Montgomery told
him that, once the Hansen suit was concluded, he would be able to inform
Byrd of the exact amount Byrd owed on the expenses.  We recognize Byrd posited
he had no obligation to pay any of the expenses, but this testimony at least
negates his contention that Montgomery intended to waive his right to recovery.
       

B.        Mitigation of Damages








Byrd
also contends there was sufficient evidence Montgomery failed to mitigate
damages.  Byrd pleaded this defense and requested a jury instruction or
question, which the trial court refused.  Again, Byrd does not challenge the
trial court=s refusal to submit this defense and request we reverse for a new trial
on the amount of Montgomery=s damages even if we interpret the agreement in Montgomery=s favor.  Instead, Byrd apparently
maintains this defense was conclusively established and precluded any recovery
from Byrd.  Nevertheless, we conclude Byrd did not present any evidence on
failure to mitigate, much less conclusively establish this defense. 

The
mitigation‑of‑damages doctrine requires an injured party, following
a breach, to exercise reasonable care to minimize his damages if it can be done
with slight expense and reasonable effort.  Allen v. Am. Gen. Fin., Inc.,
251 S.W.3d 676, 686 (Tex. App.CSan Antonio 2007, pet. granted) (citing Great Am. Ins. Co.
v. N. Austin Mun. Util. Dist. No. 1, 908 S.W.2d 415, 426 (Tex. 1995));  Cotten
v. Weatherford Bancshares, Inc., 187 S.W.3d 687, 708 (Tex. App.CFort Worth 2006, pet. denied).  Byrd
cites Montgomery=s testimony that, if he had paid the Marshall judgment
when rendered instead of pursuing appeals, his expenses would have been less
and he would have still owed money to Byrd under the agreement.  We note that
Byrd testified he wanted Montgomery to defend both employee suits because Byrd
strongly believed he had committed no wrongdoing.  Nonetheless, Montgomery
incurred all of the Marshall expenses before he demanded
reimbursement from Byrd.  It was Byrd=s subsequent refusal to pay a portion
of the expenses that constituted breach of the agreement.  Therefore,
Montgomery=s decision to appeal the Marshall judgment did not constitute a
failure to mitigate damages resulting from Byrd=s breach.

Moreover,
Paragraph D4 simply requires Byrd to pay a sum certainC1/3 of the Marshall and Hansen
claimsCwithout any condition based on the
manner in which Montgomery defended the claims.  Consequently, Montgomery=s vigorous defense of the separate Marshall
suit was not evidence of failure to mitigate damages in the present case.

V.  Conclusion 








Montgomery
conclusively established that Byrd was required to pay Montgomery $84,103.95
under Paragraph D4, Byrd breached the agreement by refusing to do so, and
Montgomery owed Byrd $60,000 under the agreement.  Therefore, the trial court
erred by denying Montgomery=s request for a directed verdict because he proved
entitlement to judgment for $24,103.95 as a matter of law.  The only question
that should have been submitted to the jury was the amount of Montgomery=s reasonable attorney=s fees, which he may recover as
prevailing party on a breach-of-contract action.  See Tex. Civ. Prac.
& Rem. Code Ann. ' 38.001(8) (Vernon 2008).  This question was submitted but
not answered because a response was conditioned on a finding that Byrd breached
the agreement.  Therefore, further proceedings are necessary to determine the
amount of Montgomery=s reasonable attorney=s fees.  Accordingly, we sustain
Montgomery=s sole issue.  We reverse the trial court=s judgment, as modified by its
subsequent order, and remand with instructions that the trial court render
judgment in favor of Montgomery for $24,103.95, plus reasonable attorney=s fees and pre-judgment and
post-judgment interest.

 

 

 

/s/        Charles
W. Seymore

Justice

 

Panel consists of Chief
Justice Hedges and Justices Anderson and Seymore.









[1]  Because all dispositive issues are settled in law,
we issue a memorandum opinion.  See Tex. R. App. P. 47.4.

 





[2]  Montgomery also pleaded unjust enrichment, fraud,
and negligent misrepresentation, but only breach of contract was ultimately
submitted to the jury.  





[3]  Alternatively, Montgomery contends the evidence is
legally and factually insufficient to support the jury=s finding that Byrd did not breach the agreement and
its failure to answers the questions concerning Byrd=s excuse defense and Montgomery=s damages and attorney=s fees.  Montgomery contends these questions should have been answered
favorably to him because, under his interpretation of the agreement, Byrd
failed to comply as a matter of law and owed Montgomery $84,103.95. 
Additionally, Montgomery asserts the evidence is legally and factually
insufficient to support all the jury=s
answers in favor of Byrd  because Byrd had no right to recover damages and
attorney=s fees once the $60,000 Montgomery owed Byrd was
offset by the $84,103.95.  We agree the evidence is legally insufficient to
support all these answers and failures to answer because a challenge to denial
of a directed verdict is a legal-sufficiency challenge.  However, we resolve
the appeal by concluding the trial court should have granted Montgomery=s motion for directed verdict and not submitted these
jury questions in the first place, except for the issue regarding Montgomery=s attorney=s
fees.





[4]           This exchange occurred as follows:

 

Q.         And third parties.  Now, that means, not
you and not Mr. Montgomery, but parties who are not parties to this agreement? 
Third parties?  Do you understand that?

A.         Yes, Sir.

. . .

Q.         Okay.  I=m
just trying to get you to identify by third parties, that would be people like
Mr. Marshall?  Or someone who is not a party to this agreement?

A.         Yes, sir.





[5]  In the clause defining  ARepresentatives@ to
include Aall of that person=s or
entity=s past or present principals, agents, servants,
employees . . . ,@ (emphasis added), it is unclear whether Apast or present@
applies only to Aprincipals,@ as
the word immediately following Apast or
present,@ or all persons and entities listed after Apast or present,@
which would include employees.  Because we conclude former employees were
third-parties for purposes of Paragraph D4, we will assume, without deciding,
that they were included in this definition.





[6]  As a further example, as we have mentioned, the
agreement requires Montgomery to pay $330,000 to Byrd in various installments. 
All the persons and entities included within the broad definitions of
Montgomery at the outset of the agreement cannot be obligated to pay this sum
to Byrd when they did not sign the agreement.  Although this provision
requiring payment is not in dispute, it does simply illustrate why the broad
definition of the parties cannot possibly apply to all portions of the
agreement.





[7]  Arguably, these release provisions relied on by Byrd
refer to release of Byrd for only claims arising out of Athe Dispute.@ 
At the outset of the agreement, Athe
Dispute@ is defined as Aany
disagreement as to the ownership of the business known as USA Precision
Machining Co. and the assets utilized in carrying out or furtherance of the business,@ which does not seem to encompass claims by former
employees alleging they were improperly compensated during their tenure with
the company.  In fact, various release provisions  indicate the broad
definitions of the parties at the outset of the agreement were included to
ensure that all persons and entities specified therein were released from any
claims related to Athe Dispute@
between Montgomery or Byrd.  Moreover, the initial recital in Section D1 of the
AMutual Release@
Section seems to confirm this intent:

 

It is the intent of the parties hereto that Richard
Byrd and Chester Montgomery execute the agreement and by executing this
Settlement Agreement shall, with their respective Entities and Derivative
Claimants, by reason of such execution, be entirely free of any and all actual
or potential claims, suits, demands, causes of action, charges or grievances of
any kind or character regardless of the nature or extent of the same, arising
out of this Dispute.

 

However, we need not decide whether Byrd is otherwise
released under the cited provisions because Paragraph D4 supercedes these other
provisions.